JUDGE STANTON

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

14 CV 1041

| | |
|---|---|
| CENTRAL LABORERS' PENSION FUND and STEAMFITTERS LOCAL 449 PENSION FUND, Derivatively on Behalf of JPMORGAN CHASE & CO.,<br><br>Plaintiffs,<br><br>vs.<br><br>JAMES DIMON, LINDA B. BAMMANN, JAMES A. BELL, CRANDALL C. BOWLES, STEPHEN B. BURKE, JAMES S. CROWN, TIMOTHY P. FLYNN, LABAN P. JACKSON, MICHAEL A. NEAL, LEE R. RAYMOND, WILLIAM C. WELDON, WALTER V. SHIPLEY, and ROBERT I. LIPP,<br><br>Defendants.<br><br>-and-<br><br>JPMORGAN CHASE & CO., a Delaware corporation,<br><br>Nominal Defendant. | Civil Action No. ______________<br><br>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, CORPORATE WASTE, UNJUST ENRICHMENT, AND VIOLATIONS OF THE FEDERAL SECURITIES LAWS |

RECEIVED
FEB 19 2014
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs Central Laborers' Pension Fund and Steamfitters Local 449 Pension Fund (collectively, "Plaintiffs"), by their undersigned attorneys, allege based upon: (i) Plaintiffs' counsel's personal interviews of Bernard Madoff ("Madoff"); (ii) the Deferred Prosecution Agreement entered into between the United States Attorney's Office for the Southern District of New York ("U.S. Attorney") and JPMorgan Chase Bank, N.A. (along with its parent company, affiliates, and predecessors in interest, "JPMorgan" or "the Bank"); (iii) the complaint filed against JPMorgan by Irving Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BMIS," "Madoff Securities," or "BLM"), in *Irving H. Picard v. JPMorgan Chase & Co.*, No. 11-cv-913 (CM) (S.D.N.Y) (Dkt. No. 50) (the "Trustee Complaint"); (iv) filings with the Securities and Exchange Commission ("SEC") and other public information; (v) information and belief; and (vi) as to allegations pertaining to themselves, personal knowledge, as follows:

## OVERVIEW OF THE ACTION

1.      On January 6, 2014, JPMorgan entered into the Deferred Prosecution Agreement wherein JPMorgan agreed to pay $2.6 billion to various federal authorities and plaintiffs in civil cases stemming from two felony violations of the Bank Secrecy Act ("BSA") in connection with its two-decades-long financial relationship with Madoff.

2.      As part of the Deferred Prosecution Agreement, JPMorgan admitted and stipulated that the facts set forth in the Statement of Facts, attached to the Deferred Prosecution Agreement, were true and accurate.  The Statement of Facts depict a bank with unparalleled insight into Madoff's fraud.  However, the extent to which JPMorgan's actual knowledge of or willful blindness to Madoff's fraud reached the highest echelon of the Bank is not disclosed in the Deferred Prosecution Agreement, nor anywhere else in the public record.

3.      As part of their investigation into the facts underlying this action, counsel for Plaintiffs personally interviewed Madoff in person and by telephone.  According to Madoff, he was

repeatedly confronted with significant concerns about irregularities in his SEC filings by the senior-most executives at JPMorgan: Walter V. Shipley ("Shipley"), Chief Executive Officer ("CEO") of JPMorgan predecessors Chemical Bank Corp. ("Chemical Bank") (1981-1991 and 1993-1996) and Chase Manhattan Bank ("Chase") (1996-1999), and Robert I. Lipp ("Lipp"), a member of JPMorgan's Board of Directors (the "Board") from 2003 to 2008 and a Senior Advisor to JPMorgan from 2005 to 2008.

4.      JPMorgan was the primary banker for Madoff and his firm, BMIS, for more than 20 years.  Billions of dollars that Madoff stole from his customers passed through BMIS's account at JPMorgan.  JPMorgan was also the banker for Norman Levy ("Levy"), who was an extremely important client of JPMorgan's Private Bank; Levy was also a longtime and important customer of BMIS.  JPMorgan, therefore, had unique visibility into both sides of transactions between Madoff and Levy.

5.      During Plaintiffs' counsel's interviews with Madoff, Madoff explained that JPMorgan reviewed Levy's brokerage statements, which showed billions of dollars in debit balances and margin accounts with Madoff – indicating that Madoff was investing Levy's money and that Levy had outstanding loans due Madoff.  Madoff also explained that JPMorgan examined Madoff's SEC-mandated Financial and Operational Combined Uniform Single Reports ("FOCUS Reports") and income statements, which showed no customer receivables to, or payables from, Levy (or any other customers) – giving the impression that Madoff was ***not*** investing Levy's money or lending him money on margin.  According to Madoff, he concealed this information from the FOCUS Reports because he did not want the SEC to know that he was running an undisclosed investment-advisory business and to ask where his (non-existent) securities were located.

6.     These troubling discrepancies were flagged by JPMorgan's relationship managers for Madoff, including Richard Cassa ("Cassa"), and the Chief Risk Officer at JPMorgan's Investment Bank, John Hogan ("Hogan"), and other credit officers at the Bank.  Madoff said that both he and Levy faced questions once every quarter from relationship managers at JPMorgan over these discrepancies.  When Levy asked Madoff how to respond to these questions, Madoff told Levy not to answer the Bank's questions.

7.     Ultimately, the task of confronting Madoff about JPMorgan's concerns about the discrepancies between the FOCUS Reports and Levy's brokerage statements was passed to Shipley, and then to Lipp.  According to Madoff, from the 1990s through the 2000s, Shipley and Lipp would meet Madoff for lunch, frequently along with Levy, and raise their concerns as an after-thought at the end of the meeting.

8.     When Shipley and Lipp asked why Madoff's FOCUS Reports or income statements did not reflect any margin debit balances, whereas Levy's personal bank statements showed Madoff to be managing Levy's money and extending him loans, Madoff told them he could not discuss information about his clients with them, and they would have to ask Levy for an explanation.

9.     According to Madoff, when Shipley and Lipp turned to Levy with their concerns, Levy threatened that he would withdraw his money from JPMorgan if they bothered him with these questions.  Madoff explained that Levy was famous for his bluster and excitability.  Madoff recalled that Levy told them, "I don't need you, I have more money than you."  As Madoff explained, this was theater to Levy, which he got a kick out of doing.

10.    According to Madoff, JPMorgan was petrified of Levy.  Madoff said Shipley and Lipp would "cower" because Levy was such an important customer of JPMorgan's Private Bank.  Thus, faced with the choice of shutting down Madoff's account and losing lucrative profits, or

turning a blind eye to the troubling and unanswered questions presented by Madoff, JPMorgan – at its highest level – chose to turn a blind eye.  As explained herein, over the course of Madoff's fraud, JPMorgan would repeatedly choose willful blindness when faced with mounting red flags until, finally, Madoff's Ponzi scheme was revealed.

11.     Madoff explained in his interview that his motivation to now discuss JPMorgan's role in his Ponzi scheme is to help his victims recover assets that he stole.

12.     Although Madoff's statements about Shipley's and Lipp's suspicions concerning the Madoff-Levy relationship have never before been disclosed publicly, his statements are corroborated by facts concerning that relationship admitted by JPMorgan in the Deferred Prosecution Agreement and alleged in the Trustee Complaint.  Madoff, however, has taken those facts one step further and elevated direct knowledge of the facts to the doorstep of JPMorgan's CEO and its Board of Directors.  By this action, Plaintiffs seek to vindicate JPMorgan's rights against its wayward fiduciaries.

## NATURE OF ACTION

13.     This is a shareholder derivative action brought on behalf of JPMorgan Chase & Co., the corporate parent of JPMorgan Chase Bank, N.A., seeking to pursue claims against the Defendants on behalf of JPMorgan, for disgorgement of profits and financial benefits obtained by the Defendants, restitution, recovery of damages sustained by JPMorgan, and other relief.  This action asserts claims for breaches of fiduciary duty by JPMorgan's CEO and Chairman James Dimon ("Dimon"), current members of JPMorgan's Board, JPMorgan's former CEO Shipley, and JPMorgan's former director Lipp.

14.     On October 28, 2013, Plaintiffs' counsel interviewed Bernard Madoff in prison in Butner, North Carolina.  Before and after the in-person interview, Plaintiffs' counsel interviewed Madoff via telephone several times.  On January 6, 2014, JPMorgan entered into the Deferred

Prosecution Agreement with the U.S. Attorney in which it consented to the filing of a two-count criminal Information charging JPMorgan with failure to maintain an effective anti-money laundering program, and failure to file a suspicious activity report, in connection with its relationship with Madoff. On June 24, 2011, the Trustee filed the Trustee Complaint against JPMorgan resulting from its relationship with Madoff. The allegations below concerning JPMorgan's willful blindness to Madoff's Ponzi scheme are largely based on Plaintiffs' counsel's interviews of Madoff, the Deferred Prosecution Agreement, and the Trustee Complaint.

15.     Plaintiffs' claims arise from the massive Ponzi scheme perpetrated by Madoff through his investment firm BMIS. As the public learned on December 11, 2008, the date of Madoff's arrest, Madoff stole hundreds of millions of dollars for personal enrichment and misappropriated billions more to perpetuate the scheme, in what is the largest fraud in financial history. Not a single penny of customers' money was invested in any securities. As a result, Madoff has been sentenced to 150 years in prison.

16.     While numerous financial institutions enabled Madoff's fraud, JPMorgan was at the very center of that scheme: (1) the money customers deposited into BMIS's account at JPMorgan was not used to purchase securities, but instead was merely transferred to other customers in patterns that could serve no legitimate business purpose; (2) millions of dollars routinely bounced back and forth between Madoff and one of JPMorgan's most important customers, Levy; (3) JPMorgan could see that Madoff's regulatory filings were materially inconsistent with Levy's account statements; and (4) JPMorgan's Investment Bank conducted due diligence on Madoff that turned up numerous red flags of fraud. But rather than put a stop to it, JPMorgan chose to continue to turn a blind eye to Madoff's thievery.

17.     Madoff cultivated a strong business relationship with JPMorgan and, from at least 1992, Madoff had all, or virtually all, money received in his fraudulent investment-advisory business deposited into accounts he held at what was then Chase in Manhattan and in a Chase branch in Delaware.  By 2006, Madoff had billions of dollars in cash on deposit at JPMorgan.  These were demand deposits, meaning that JPMorgan had full use of the funds until Madoff withdrew them.

18.     Each victim that opened an account with BMIS received an account number.  Madoff only accepted cash investments, which were directed to Account #140-081703 at Chase in Manhattan (the "703 Account").  According to the Trustee Complaint, the 703 Account belonged to BMIS, although deposits were almost invariably sent to the benefit of "Bernard L. Madoff."

19.     Upon information and belief, between 2006 and the middle of 2008, the 703 Account had an average balance of several billion dollars.  As the financial markets began to sharply decline in 2008, however, the cash balance in the 703 Account began to drop precipitously.  According to the Trustee Complaint, from September 2008 until December 11, 2008, the 703 Account balance often dropped nearly to zero.  In November 2008, the balance dropped close to zero several times, forcing Madoff to transfer at least $164 million from accounts at BMIS's London affiliate, Madoff Securities International Ltd. ("MSIL"), to the 703 Account.  For the month of November 2008, $300 million was deposited by victims to the 703 Account and Madoff withdrew $320 million.

20.     Indeed, while billions of dollars flowed through the 703 Account, none of it was used to buy or sell any securities during the entire life of the Ponzi scheme, as it should have been had BMIS been legitimate.  Instead, emblematic of a Ponzi scheme, the money in the 703 Account merely flowed back and forth between Madoff and his customers, while Madoff syphoned off hundreds of millions of dollars for himself.  JPMorgan allowed Madoff to funnel billions of dollars through the 703 Account with actual knowledge of, or willful blindness to, clearly illicit transaction

- 6 -

activity within that account – including billions of dollars in suspicious transactions with its own private banking customers, especially Levy – and disregarding its own anti-money laundering policies.  Rather than put a stop to Madoff's suspicious activities, JPMorgan permitted them to continue as JPMorgan's drive for fees and profits became a substitute for common sense, ethics and legal obligations.

21.   JPMorgan's knowledge of red flags of Madoff's fraud went beyond the Bank's awareness of suspicious activity in the 703 Account, and extended to its knowledge of red flags in Madoff's FOCUS Reports that were filed with the SEC.  According to Plaintiffs' counsel's personal interviews with Madoff, the FOCUS Reports contained glaring irregularities that JPMorgan actually did probe – but never received satisfactory answers to its questions.  For example, BMIS's FOCUS Reports did not reflect any accounts receivable or payable to customers, while at the same time JPMorgan knew that its own private-banking clients, especially Levy, had brokerage statements showing billions of dollars in debit balances and margin balances to Madoff.  JPMorgan had knowledge of these material omissions in BMIS's FOCUS Reports, but willfully ignored them.

22.   In addition to its serious concerns over Madoff's suspicious transactions with Levy and irregularities in Madoff's FOCUS Reports, JPMorgan's own due diligence executives uncovered a litany of red flags indicating Madoff was running a fraud.

23.   Besides for being Madoff's and BMIS's banker, JPMorgan also profited itself from the Ponzi scheme by selling to its clients structured products related to BMIS "feeder funds" – funds that sent investor money to BMIS.  In the course of structuring these products, JPMorgan performed due diligence on BMIS beginning in the late 1990s and again in or about 2006, using information it obtained from those responsible at JPMorgan for the 703 Account, as well as information provided by various BMIS feeder funds.

24.     According to the Deferred Prosecution Agreement, Chase Alternative Asset Management ("CAAM"), the JPMorgan fund of funds open to institutional investors, reviewed Madoff's reported returns in the late 1990s.  One CAAM fund manager commented on approximately December 10, 1998 that Madoff's returns were "possibly too good to be true," and that there were "too many red flags to proceed with further due diligence."

25.     In 2007, JPMorgan's fund of funds again considered a Madoff investment, and also discontinued the due diligence early on because the first stages of the process provided "little additional insight as to the source of the [Madoff Securities] returns" and because JPMorgan learned that Madoff would not meet with JPMorgan personnel to answer their questions.

26.     Based on this due diligence, at some point between 2006 and the fall of 2008, if not before, JPMorgan unquestionably knew that: BMIS's returns were consistently too good to be true; Madoff would not allow transparency into his strategy; JPMorgan, one of the world's leading and most knowledgeable derivatives dealers, could not identify, and Madoff refused to provide information on, his purported over-the-counter ("OTC") counterparties; BMIS's auditor was a small, unknown firm; Madoff and/or BMIS had a conflict of interest by acting as the clearing broker, sub-custodian and sub-investment adviser; feeder-fund administrators could not reconcile the daily position numbers they got from Madoff with any third-party source to confirm their accuracy; and there was public speculation that Madoff operated a Ponzi scheme, or was engaged in other illegal activity, such as front running.

27.     Although JPMorgan's due diligence revealed alarming red flags of fraud at BMIS, JPMorgan was not concerned with the devastating effect on shareholders or its legal and moral obligations.  It was concerned only with its bottom line, and, according to the Trustee Complaint, did nothing but a cost-benefit analysis in deciding to become part of Madoff's scheme:  "Based on

overall estimated size of BLM strategy, it would take [a] . . . fraud in the order of $3bn or more . . . for JPMorgan to be affected."   JPMorgan also relied on the Securities Investor Protection Corporation ("SIPC") to protect its profits: "JPMorgan's investment in BLM . . . is treated as customer money . . . and therefore [is] covered by SIPC."   By the fall of 2008, in the midst of a worldwide economic downturn, the cost-benefit analysis had changed.   JPMorgan, no longer comfortable with the risk of fraud, decided to redeem its $276 million in investments in BMIS feeder funds.  JPMorgan also received an additional transfer of $145 million from BMIS in June 2006.

28.     Indeed, JPMorgan's due-diligence team was further concerned about fraud at BMIS in the wake of the fraud perpetrated by Minnesota businessman Tom Petters that was revealed earlier in 2008.  Some of these concerns centered on BMIS's small, unknown auditor, Friehling & Horowitz ("Friehling"):

> The "DD" [due diligence] done by all counterparties seems suspect. Given the scale and duration of the Petters fraud it cannot be sufficient that there's simply trust in an individual and there's been a long operating history. . . .  Let's go see Friehling and Horowitz the next time we're in NY . . . to see that the address isn't a car wash at least.

29.     In or about September 2008, as JPMorgan was reevaluating its hedge fund investments in the midst of the worldwide financial crisis, Alain Krueger, of JPMorgan's London office, had a telephone call with individuals at Aurelia Finance, S.A. ("Aurelia Finance"), a Swiss company that purchased and distributed JPMorgan's structured products.  During the course of that call, the individuals at Aurelia Finance made ominous references to "Colombian friends" and insisted that JPMorgan maintain its BMIS-related hedge.  That conversation triggered a concern that Colombian drug money was somehow involved in the BMIS-Aurelia Finance relationship, which led to an internal investigation at JPMorgan of BMIS and Aurelia Finance for money laundering. Significantly, it was only when its own money was at stake that JPMorgan finally decided to report BMIS to a government authority.

30.     According to the Deferred Prosecution Agreement, on October 16, 2008, an analyst[1] from JPMorgan's Equity Exotics & Hybrids ("Equity Exotics") Desk, the division within JPMorgan's Investment Bank that was primarily responsible for structuring and issuing products related to BMIS feeder funds, wrote a lengthy e-mail to the head of the Equity Exotics Desk and others summarizing the due diligence conducted the previous month on Madoff feeder funds (the "October 16 Memo").  The October 16 Memo described the inability of JPMorgan or the feeder funds to validate Madoff's trading activity or custody of assets. The October 16 Memo noted that the feeder funds were audited by major accounting firms, which had issued unqualified opinions for 2007, but questioned Madoff's "odd choice" of a small, unknown accounting firm.  The October 16 Memo reported that personnel from one of the feeder funds "said they were reassured by the claim that FINRA [Financial Industry Regulatory Authority] and the SEC performed occasional audits of Madoff," but that they "appear not to have seen any evidence of the reviews or findings."  The October 16 Memo also questioned the reliability of information provided by the feeder funds and the willingness of the feeder funds to obtain verifying information from Madoff.  For example, the memo reported that personnel at one feeder fund "seem[ed] very defensive and almost scared of Madoff.  They seem unwilling to ask him any difficult questions and seem to be considering his 'interests' before those of the investors.  It's almost a cult he seems to have fostered."  The Equity Exotics analyst further wrote that there was both a "lack of transparency" into Madoff Securities and "a resistance on the part of Madoff to provide meaningful disclosure."

31.     The October 16 Memo ended with the observation that: "[t]here are various elements in the story that could make us nervous," including the fund managers' "apparent fear of Madoff, where no one dares to ask any serious questions as long as the performance is good."  The October

---

[1]     Upon information and belief, the analyst is Scott Palmer.

16 Memo concluded: "I could go on but we seem to be relying on Madoff's integrity (or the [feeder

funds'] belief in Madoff's integrity) and the quality of the due diligence work (initial and ongoing)

done by the custodians . . . to ensure that the assets actually exist and are properly custodied.  If

some [thing] were to happen with the funds, our recourse would be to the custodians and whether

they had been negligent or grossly negligent."

32.     On or about October 29, 2008, JPMorgan admitted in a filing of suspicious activity

made to the United Kingdom's Serious Organised Crime Agency ("SOCA") that it knew that

Madoff was "too good to be true," and was likely stealing from his customers:

> (1) . . . [T]he investment performance achieved by [BMIS's] funds . . . is so
> consistently and significantly ahead of its peers year-on-year, even in the prevailing
> market conditions, as to appear too good to be true-meaning that it probably is; and
> (2) the lack of transparency around Madoff Securities trading techniques, the
> implementation of its investment strategy and the identity of its OTC option
> counterparties; and (3) its unwillingness to provide helpful information.

33.     None of this information was new to JPMorgan – it had known it for years.  It was

only in an effort to protect its own investments that JPMorgan finally decided to inform a

government authority about BMIS.  According to the Trustee Complaint, JPMorgan further sought

permission from SOCA to redeem its Aurelia Finance-related investments and admitted that "as a

result [of these issues with BMIS] [JPMorgan] has sent out redemption notices in respect of one

fund, and is preparing similar notices for two more funds."

34.     Even when it admitted knowing that Madoff had to be a Ponzi scheme in October

2008, JPMorgan still did nothing to stop it.  Significantly, although JPMorgan filed a suspicious

activity report in the United Kingdom, it did not file such a report with U.S. regulators – a criminal

violation of federal law for which it was charged in the Information – and therefore the 703 Account

remained open.

35.     According to the Deferred Prosecution Agreement, as of October 16, 2008, the date of the October 16 Memo, the 703 Account had a balance of $3.7 billion.  Between October 16, 2008 and Madoff's arrest, approximately $3.5 billion of the $3.7 billion in Madoff's account at JPMorgan had been withdrawn by Madoff to pay customer redemptions, leaving the account with just $234 million in cash on the day of Madoff's arrest.

36.     Demand on the JPMorgan Board to assert the claims contained herein would be futile. JPMorgan's Board currently consists of 11 members, of which seven were directors during the relevant period prior to the exposure of Madoff's fraud in December 2008 (Defendants Dimon, Bowles, Burke, Crown, Jackson, Raymond, and Weldon) (defined below).  These seven directors also served on JPMorgan's Board alongside Lipp (whom Plaintiffs would be otherwise asking the Board to sue).  In particular, as explained herein, Board Chairman and CEO Dimon has a long professional and personal relationship with Lipp spanning more than 25 years.  Any suit to remedy the wrongs complained of herein would expose these seven current directors to significant personal liability for their breaches of fiduciary duties and other misconduct because these current directors participated in, approved, ratified, or permitted the conduct described herein.

37.     The Deferred Prosecution Agreement specifically requires JPMorgan to cooperate with federal government agencies regarding any matter relating to the conduct described in the criminal Information or Statement of Facts, or any matter relating to the fraud committed at BMIS. Moreover, the Deferred Prosecution Agreement provides that should the U.S. Attorney determine, in its sole discretion, that JPMorgan has knowingly given false, incomplete or misleading information either during the term of the Deferred Prosecution Agreement or in connection with the U.S. Attorney's investigation of the conduct described in the Information or Statement of Facts, JPMorgan shall, in the U.S. Attorney's sole discretion, thereafter be subject to prosecution for any

federal criminal violation, or suit for any civil cause of action, including, but not limited to, a prosecution or civil action based on the Information, the Statement of Facts, the conduct described therein, or perjury and obstruction of justice.  ***Because the facts concerning the involvement with Madoff of Defendants Shipley and Lipp are not disclosed in the Statement of Facts or anywhere else in the Deferred Prosecution Agreement, it does not appear that the Director Defendants disclosed them to the U.S. Attorney, and thus, upon information and belief, JPMorgan, by its Board, has knowingly given false, incomplete or misleading information to the U.S. Attorney***. Therefore, the present action exposes the Director Defendants to criminal liability as well as civil liability.  As a result, they cannot be expected to prosecute claims asserted by Plaintiffs against themselves and/or persons or entities with which they have extensive interrelated business and professional and personal entanglements, including Defendants Shipley and Lipp.  As such, and for the further reasons detailed herein, a majority of JPMorgan's Board members are personally interested in the subject matter of the claim and are not disinterested and independent, as alleged herein.

38.    Plaintiffs seek to recover, for the benefit of JPMorgan: (i) the costs and expenses JPMorgan has incurred to date in connection with investigations, regulatory proceedings and litigation arising out of its relationship with Madoff; (ii) all such future costs; (iii) all damages JPMorgan has suffered to its reputation and business; and (iv) the expenses JPMorgan incurs in this litigation, including any advancement to Defendants.

## JURISDICTION AND VENUE

39.    The claims asserted herein arise under §14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78n(a), and Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated thereunder, and under common law for violations of breach of fiduciary duty, abuse of control, corporate waste, and unjust enrichment.  In connection with the acts, conduct and other wrongs

- 13 -

complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

40.     This Court has subject matter jurisdiction pursuant to the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1331.  This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

41.     This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

42.     This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operation in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

43.     Venue is proper in this District under 28 U.S.C. §1391 because: (a) JPMorgan maintains its principal place of business in this District; (b) a substantial portion of the transactions and wrongs complained of herein – including Defendants' primary participation in the wrongful acts – occurred in this District; and (c) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District. Nominal Defendant JPMorgan is incorporated in Delaware with its principal place of business in this District.

**PARTIES**

44.     Plaintiff Central Laborers' Pension Fund is a current stockholder of JPMorgan and was a stockholder during the time of the misconduct alleged herein and has been such continuously since then.  Central Laborers' Pension Fund owns approximately 47,811 shares of JPMorgan and has held JPMorgan shares continuously since at least October 2001.  Central Laborers' Pension Fund will continue to hold JPMorgan shares at least through the resolution of this action.

45.    Plaintiff Steamfitters Local 449 Pension Fund is a current stockholder of JPMorgan and was a stockholder during the time of the misconduct alleged herein and has been such continuously since then.  Steamfitters Local 449 Pension Fund owns approximately 29,497 shares of JPMorgan and has held JPMorgan shares continuously since August 2003.  Steamfitters Local 449 Pension Fund will continue to hold JPMorgan shares at least through the resolution of this action.

46.    Nominal Defendant JPMorgan Chase & Co. is a financial holding company incorporated under Delaware law with its principal place of business at 270 Park Avenue, New York, New York 10017.  JPMorgan Chase & Co. is the largest banking institution in the United States, with approximately $2.36 trillion in assets and $204.1 billion in stockholders' equity as of December 31, 2012.  JPMorgan Chase & Co. serves more than 30 million consumer customers, has banking relationships with more than 99% of the Fortune 1000 companies, and maintains operations in more than 50 countries.  JPMorgan Chase Bank, N.A. is JPMorgan Chase & Co.'s main bank subsidiary and is organized under the laws of the United States with its principal place of business at 111 Polaris Parkway, Columbus, Ohio 43240.  JPMorgan Chase Bank, N.A. is a national banking association in the United States with locations in 23 states, including a location in New York, New York.  JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., their affiliated entities, subsidiaries, and predecessors in interest are collectively referred to herein as "JPMorgan."

47.    Defendant James Dimon is JPMorgan's Chairman and CEO.  Defendant Dimon became Chairman of the Board on December 31, 2006, and has been CEO and President since December 31, 2005. He had been President and Chief Operating Officer since JPMorgan's merger with Bank One Corporation ("Bank One") in July 2004.

48.    Defendant Linda B. Bammann ("Bammann") has served as a director of JPMorgan since September 2013.

- 15 -

49.     Defendant James A. Bell ("Bell") has served as a director of JPMorgan since 2011. Defendant Bell also served on JPMorgan's AML Enhancement Committee and Audit Committee.

50.     Defendant Crandall C. Bowles ("Bowles") has served as a director of JPMorgan since 2006. Defendant Bowles has served on the Company's Audit Committee from 2006 through the present and currently serves as the Chair of the Public Responsibility Committee.  Defendant Bowles serves on an Anti-Money Laundering ("AML") Enhancement Committee.

51.     Defendant Stephen B. Burke ("Burke") has served as a director of JPMorgan since 2003.  Defendant Burke is a member of JPMorgan's Compensation & Management Development Committee and Corporate Governance & Nominating Committee.

52.     Defendant James S. Crown ("Crown") has served as a director of JPMorgan since 1991. During the relevant time period, Defendant Crown served on JPMorgan's Public Responsibility Committee and Risk Policy Committee.

53.     Defendant Timothy P. Flynn ("Flynn") has served as a director of JPMorgan since 2012.  Since 2012, Defendant Flynn served as a member of JPMorgan's Risk Policy Committee.

54.     Defendant Laban P. Jackson, Jr. ("Jackson") has served as a director of JPMorgan since 2004 and a director of Bank One from 1993 to 2004.  During the relevant time period, Defendant Jackson served as Chairman of the Audit Committee. Defendant Jackson serves on the Board's Review Committee established in connection with the Firm's Chief Investment Office. Defendant Jackson also served on JPMorgan's Mortgage Compliance Committee and the AML Enhancement Committee.

55.     Defendant Michael A. Neal ("Neal") has served as a director of JPMorgan since January 2014.

56.     Defendant Lee R. Raymond ("Raymond") has served as a director of JPMorgan since 2001 and director of J.P. Morgan & Co. Incorporated from 1987 to 2000. During the relevant time period, Defendant Raymond served on JPMorgan's Corporate Governance & Nominating Committee and the Compensation & Management Development Committee.

57.     Defendant William C. Weldon ("Weldon") has served as a director of JPMorgan since 2005. During the relevant time period, Defendant Weldon chaired JPMorgan's Compensation & Management Development Committee and was a member on the Corporate Governance & Nominating Committee.

58.     Defendants Dimon, Bammann, Bowles, Bell, Burke, Crown, Flynn, Jackson, Neal, Raymond, and Weldon are collectively referred to as the "Director Defendants."

59.     Defendant Walter V. Shipley served as Chairman and CEO of JPMorgan predecessor Chemical Bank beginning in 1981.  When Chemical Bank merged with Manufacturers Hanover Trust ("Manufacturers Hanover") in 1991, Shipley stepped down as CEO so that Manufacturers Hanover chief John McGillicuddy could be CEO of the combined entity.  In 1993, Shipley assumed the Chairman and CEO positions from McGillicuddy.  When Chemical Bank merged with Chase in 1996, Shipley served as CEO of the combined entity (JPMorgan's predecessor) until 1999.

60.     Defendant Robert I. Lipp served as a director of JPMorgan from 2003 until September 2008.  From September 2005 through September 2008, Defendant Lipp served as a Senior Advisor to JPMorgan.  Lipp also worked at JPMorgan predecessor Chemical Bank for 23 years, from approximately 1963 to 1986.  As President of Chemical Bank's Retail Banking division in the 1980s, Lipp reported directly to Shipley.

61.     Defendants Dimon and Lipp have known each other for more than 25 years and share a long and storied professional history.  Dimon and Lipp, serving under Sandy Weill, worked closely

together over many years to build up numerous companies that would eventually merge into Citigroup Inc.  In 1986, Dimon and Lipp were part of the management team at Commercial Credit Company ("Commercial Credit").  In 1988, after Commercial Credit merged with Primerica Corporation ("Primerica"), Dimon became President and Lipp served as Vice Chairman of the company and chair of the consumer finance division.  In 1993, after Primerica merged with Travelers Insurance, Dimon served as President and Chief Operating Officer of the Primerica unit and Lipp served as CEO of the Travelers insurance business.  Dimon and Lipp also worked together at Bank One Corporation; Dimon was CEO from 2000 to 2004 and Lipp was a member of the board of directors from 2003 to 2004.  Finally, at JPMorgan, Dimon continues to serve as President (since July 2004), CEO (since December 2005), and Chairman (since December 2006), while Lipp served as a member of JPMorgan's Board from 2003 to 2008, and as a Senior Advisor to JPMorgan from 2005 to 2008.

62.     Collectively, Shipley, Lipp, and the Director Defendants are referred to as the "Defendants."

63.     Because of their positions within JPMorgan, Defendants had the power and authority to cause, and did cause, JPMorgan to engage in the wrongful conduct complained of herein.

### THE FIDUCIARY DUTIES OF JPMORGAN'S BOARD OF DIRECTORS

64.     The directors of a corporation are responsible for managing its affairs.  They owe the corporation an unremitting duty of loyalty and, therefore, must fulfill those functions lawfully and in accordance with the statutes, rules and regulations applicable to its business.  When faced with a known duty to act, such as in the case of requiring the corporation to comply with federal laws, directors who fail to cause the corporation to act breach their duty of loyalty and may be held liable to the corporation for damages.

65.     As fiduciaries, corporate directors must protect the corporation's assets and property against losses, whether actual or threatened.  They must avoid avoidable losses to the corporation whenever possible or reasonable to do so.  This includes, among other things, causing the corporation to implement business practices and internal controls called for by federal statutes applicable to the corporation's business.

66.     Directors also owe the corporation and its shareholders a duty of candor.  Whenever directors choose to speak on behalf of the corporation, they have a duty to speak the complete, full and unvarnished truth.  Directors who make false and misleading statements in the corporation's shareholder reports and/or SEC filings act disloyally and may be held liable to the corporation.

## SUBSTANTIVE ALLEGATIONS

**Madoff's Ponzi Scheme**

67.     Madoff controlled the investment adviser services and finances at BMIS, and he is the sole owner of BMIS, a company which he appears to have founded in the 1960s.

68.     Until his arrest, and for the preceding 40 years, Madoff owned and operated a broker-dealer business based in Manhattan.  According to the Trustee Complaint, until 2000, Madoff operated under the name Bernard L. Madoff Investment Securities, a sole proprietorship owned by Madoff.  On or about December 4, 2000, Madoff formed BMIS, a New York limited-liability company with offices at 855 Third Avenue, New York, New York, which took over all of Madoff's broker-dealer activities. Between December 2000 and December 11, 2008, Madoff was the sole member and manager of BMIS.  Madoff also opened a branch of his broker-dealer business in London, MSIL, which he principally owned and controlled.

69.     From its formation, BMIS was a broker-dealer registered with the SEC as a securities broker-dealer under §15(b) of the Exchange Act, 15 U.S.C. §78o(b).  By that registration, BMIS became a member of SIPC.  BMIS had three business units: market making, proprietary trading and

investment advisory services ("IA Business").  The IA Business was the locus of the Ponzi scheme perpetrated by Madoff through BMIS.

70.     Madoff operated his criminal IA Business in the same BMIS offices from which he operated the market-making and proprietary-trading businesses.  BMIS functioned both as an investment adviser to its customers and a custodian of their securities.  Its annual audits were purportedly performed by Friehling, an accounting firm of three employees, one of whom was semi-retired, with offices located in a strip mall in Rockland County, New York.  The precise date on which BMIS began offering investment advisory services has not been established, but it appears that BMIS was offering such services as far back as the 1960s.  BMIS's investment advisory business is widely believed to have been entirely fictional from its inception.

71.     Madoff solicited billions of dollars from investors for his phony IA Business. The final customer statements issued by BMIS for the month ending November 30, 2008 falsely reflected that BMIS customers had nearly $65 billion of net investments and related fictitious gains from those investments.

72.     Although clients of the IA Business received monthly or quarterly statements purportedly showing the securities that were held in – or had been traded through – their accounts, as well as the growth of and profit from those accounts over time, the trades reported on these statements were a complete fabrication.  The security purchases and sales depicted in the account statements never occurred and the profits reported were entirely fictitious. At his plea hearing, Madoff admitted that he never purchased ***any*** of the securities he claimed to have purchased for the IA Business's customer accounts.  Indeed, with the exception of isolated individual trades for certain clients, there is no record of BMIS having cleared any purchase or sale of securities for customers of

the IA Business at the Depository Trust & Clearing Corporation, the clearing house for such transactions, or any other trading platform on which BMIS could have reasonably traded securities.

73.     In an effort to hinder, delay or defraud authorities from detecting the Ponzi scheme, Madoff did not register BMIS as an Investment Adviser, pursuant to 15 U.S.C. §80b-3, until August 2006.  This allowed Madoff to avoid SEC scrutiny that may have uncovered his true dealings, and exposed the billions of dollars that flowed into BMIS that Madoff used as his personal piggy bank.

74.     In or about January 2008, BMIS filed with the SEC an Amended Uniform Application for Investment Adviser Registration.  The application represented, among other things, that BMIS had 23 customer accounts and assets under management of approximately $17.1 billion. In actuality, in January 2008, BMIS had 4,900 active customer accounts and purported assets under management of approximately $65 billion.

75.     According to the Trustee Complaint, there were more than 8,000 customer accounts at BMIS over the life of the Ponzi scheme. In early December 2008, BMIS generated account statements for its approximately 4,900 open customer accounts. In total, these statements showed that BMIS customers had approximately $65 billion invested through BMIS.  In reality, BMIS had assets on hand worth a fraction of that amount, most of which JPMorgan held in the 703 Account. Customer accounts had not accrued any real profits because no investments were ever made.  By the time the Ponzi scheme came to light on December 11, 2008, investors had lost nearly $19 billion in principal.

76.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC), Madoff pled guilty to an 11-count criminal information filed against him by the U.S. Attorney.  Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BMIS]."  Plea Allocution of Bernard L. Madoff at 23, *United States v. Madoff*, No.

09-CR213 (DC) (S.D.N.Y. March 12, 2009) (Dkt. No. 50).  Additionally, Madoff asserted: "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed **criminal**."  *Id.* (emphasis added).  Madoff was sentenced on June 29, 2009, to 150 years in prison.

77.    On August 11, 2009, BMIS's former Chief Finance Officer, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme.  At a plea hearing on August 11, 2009, in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS), DiPascali pled guilty to a ten-count criminal information. DiPascali admitted, among other things, that Madoff had been operating a Ponzi scheme since at least the 1980s.  *See* Plea Allocution of Frank DiPascali at 46, *United States v. DiPascali*, No. 09-CR-764 (KIS) (S.D.N.Y. Aug. 11, 2009) (Dkt. No. 11).

**Relevant JPMorgan Business Segments**

78.    JPMorgan operates six business segments: Investment Banking, Commercial Banking, Treasury & Security Services, Asset Management, Retail Financial Services and Card Services.  At least two of these six business segments, Investment Banking and Asset Management, played a role in JPMorgan's relationship with Madoff and BMIS.

79.    *Investment Banking*. JPMorgan's Investment Bank services corporations, financial institutions, governments and institutional investors in the areas of corporate strategy and structuring, capital-raising, risk management, market making, prime brokerage and research.

80.    The Investment Bank was integral to fostering the relationship between JPMorgan and BMIS.  Multiple divisions within the Investment Bank were responsible for servicing and maintaining the 703 Account, structuring and issuing products related to BMIS feeder funds, and assessing both the market and credit risks associated with BMIS and BMIS feeder funds.

81.    *Asset Management*.  Asset Management provides wealth management services to institutions, high net worth individuals and retail investors.  JPMorgan's Private Bank operates

through the Asset Management business segment.  The Private Bank decided not to conduct business with BMIS or BMIS feeder funds after performing due diligence.

**Relevant JPMorgan Divisions and Employees**

82.     *Equity Exotics & Hybrids Desk*.  Equity Exotics is the division within JPMorgan's Investment Bank that was primarily responsible for structuring and issuing products related to BMIS feeder funds.  An "exotic" is any investment that is more complicated than simply buying a basket of stocks.  Upon information and belief, Equity Exotics operates primarily out of JPMorgan's London office, and its members are employed by JPM Securities (UK).

83.     Jonathan "Bobby" Magee ran Equity Exotics during 2007 and 2008, when the group was structuring and issuing products related to BMIS feeder funds.  Andrea De Zordo, Neil McCormick and Dimitrios Nikolakopoulos all worked at Equity Exotics under Magee's leadership. While JPMorgan no longer employs McCormick and Magee, upon information and belief, De Zordo and Nikolakopoulos continue to work for JPMorgan.

84.     *Financial Institutions Group and Broker/Dealer Group*.  JPMorgan's Financial Institutions Group ("FIG") is a division of the Investment Bank responsible for servicing banks, insurance companies, financial companies and broker-dealers.  The Broker/Dealer Group is a sub-division of FIG that works out of JPMorgan's New York, New York offices, and is responsible for managing the Investment Bank's relationship with clients that are broker-dealers.   The Broker/Dealer Group was responsible for managing the 703 Account and for providing credit to BMIS.

85.     Jane Buyers-Russo was head of the Broker/Dealer Group until her departure from JPMorgan in 2010.  Richard Cassa, also a former employee, was the Client Relationship Manager in the Broker/Dealer Group responsible for BMIS's accounts and credit requests.  He also fielded requests from other divisions of JPMorgan to set up meetings with Madoff.

86.    *Equity Derivatives Group*. JPMorgan's Equity Derivatives Group ("EDG") provides equity financing and structured financing for its investors, including loans, exchange-traded funds, swaps, synthetic futures and OTC options. EDG is part of the Investment Bank.

87.    Luke Dixon, a former JPMorgan employee, was an Executive Director in EDG and worked out of JPMorgan's London office.  Scott Palmer worked alongside Dixon in EDG in London. Dixon and Palmer conducted due diligence on the BMIS feeder funds in 2008.

88.    *Risk Management Division*. The Risk Management Division consists of approximately 940 individuals that manage both market risk and credit risk at the Investment Bank. The market risk sub-division assesses the riskiness of certain fund strategies, financial products and securities, and assures that JPMorgan's financial exposures stay within internal risk guidelines. Credit risk manages the creditworthiness of transaction counterparties.

89.    John Hogan was the Chief Risk Officer at JPMorgan's Investment Bank at the time of Madoff's arrest.  He was named Chief Risk Officer for the entire bank in January 2012, until he took a leave of absence in January 2013.  He worked primarily out of the New York office.

90.    Brian Sankey is Chief Credit Officer and Deputy Chief Risk Officer and is currently responsible for all Credit Risk Management activities.  Sankey reported directly to Hogan.  Marco Bischof and James Coffman also work in Credit Risk Management.  Andrew Cox works out of London in Global Credit Risk and Client Operations for Europe, the Middle East and Africa.

91.    Richard Wise and Chen Yang work in Market Risk Management in New York, New York.  Wise is the Head of Market Risk in the Equity Division, and Yang reports to Wise.

92.    These teams from Credit Risk and Market Risk, along with Hogan, reviewed and approved JPMorgan's structured products related to the BMIS feeder funds.

93.     *Other Relevant Individuals*.  Other key individuals include Matt Zames, who heads Interest Rate Trading, Global Foreign Exchange, Public Finance, Global Mortgages, Tax-Oriented Investments and Global Fixed Income at JPMorgan's Investment Bank.  Zames works in JPMorgan's New York, New York offices.  Zames told Hogan in 2007 that Madoff was rumored to be operating a Ponzi scheme.

94.     Carlos Hernandez is the Head of Global Equities at JPMorgan's Investment Bank. Hernandez works in JPMorgan's New York, New York offices, but runs JPMorgan's equity divisions in a number of different countries.  Hernandez was involved in reviewing and approving the proposal regarding JPMorgan's structured products related to BMIS feeder funds, and purported to conduct due diligence on Madoff.

95.     Alain Krueger worked in the Structured Investments Distribution Marketing division of JPMorgan's Investment Bank.  Krueger worked out of JPMorgan's London office.  He was the JPMorgan representative who spoke to Aurelia Finance regarding JPMorgan's decision to redeem from the BMIS feeder funds.

96.     Michael Cembalest is Chief Investment Officer at J.P. Morgan Global Wealth Management, which is part of the Private Bank.  Cembalest works out of JPMorgan's New York, New York offices.  Cembalest's group conducted due diligence on BMIS and, after seeing all of the red flags, chose not to invest with any BMIS feeder funds.

**Relevant JPMorgan Committees**

97.     *Hedge Fund Underwriting Committee*. The Hedge Fund Underwriting Committee ("HFUC") was a committee at JPMorgan comprised of senior business heads and bankers, including individuals such as the Chief Risk Officer and the Heads of Equities, Syndicated Leveraged Finance, Sales, and Hedge Funds.  The purpose of the HFUC was to ensure that all senior partners who dealt with hedge funds were comfortable with proposals relating to hedge funds.  The HFUC was

presented with Equity Exotic's proposal to structure and issue products around the BMIS feeder funds.  The HFUC has since dissolved.

98.   *Investment Bank Risk Committee*.  JPMorgan's Investment Bank Risk Committee ("IBRC") meets weekly to discuss the universe of risk within the Investment Bank.  The IBRC discusses activity in the markets, policy issues, operational issues, legal issues, and the Investment Bank's reputation.  IBRC also received and reviewed the proposal by Equity Exotics.

**BMIS Feeder Funds**

99.   *Fairfield Sentry and Fairfield Sigma*.  Both Fairfield Sentry Limited ("Fairfield Sentry") and Fairfield Sigma Limited ("Fairfield Sigma") are funds run by the Fairfield Greenwich Group ("FGG").  Fairfield Sentry was among BMIS's largest feeder funds.  Fairfield Sigma invested all of its funds in Fairfield Sentry.   JPMorgan invested in both of these funds in hedging its structured-product exposure, and redeemed its interest in both funds the month before Madoff was arrested.

100.   *Herald*.  Herald Fund s.p.c. ("Herald") was a BMIS feeder fund managed by Herald Asset Management.  Day-to-day management was delegated under a service agreement to Bank Medici AG ("Bank Medici").  The founder and majority shareholder of Bank Medici was Sonja Kohn, a longtime friend of Madoff.  JPMorgan purchased an interest in Herald as part of its hedging strategy and redeemed that interest before Madoff's arrest.

101.   *Lagoon*.  Lagoon Trust Limited ("Lagoon") was another fund that fed money to BMIS. Hermes Asset Management Limited ("Hermes") managed Lagoon.  JPMorgan also invested in Lagoon to hedge its structured-product exposure.

102.   *Rye Funds*.  Rye Select Broad Market Portfolio Limited and Rye Select Broad Market Fund (together, the "Rye Funds") were two funds that fed money to BMIS and were managed by Rye Investment Management, a division of Tremont Partners Inc. ("Tremont").  Equity Exotics

requested approval for issuing hundreds of millions of dollars' worth of products structured around the Rye Funds. That transaction was never approved.

103.    *Thema*. Thema International Fund plc ("Thema") was a BMIS feeder fund managed by Bank Medici. Equity Exotics' proposal included an investment in Thema, but the investment was not approved.

**Relevant BMIS/JPMorgan Customers**

104.    *Norman Levy*. Levy was an extremely important, preferred top-tier client of JPMorgan's Private Bank, whose relationship with JPMorgan and its predecessor firms spanned more than 64 years. Levy had close business relationships with senior executives at JPMorgan's predecessor banks, as well as at JPMorgan. These individuals included John McGillicuddy, former Chairman and CEO of JPMorgan predecessors Manufacturers Hanover and Chemical Bank, Defendant Shipley, CEO of JPMorgan predecessors Chemical Bank and Chase, and Shipley's successor, William Harrison (succeeded by Defendant Dimon). According to Madoff, Levy also had a close personal relationship with Defendant Lipp. Levy was even provided an office at the Private Bank, which JPMorgan maintained for Levy even after the Private Bank had relocated. Levy also was a longtime customer of BMIS. JPMorgan accordingly had unique visibility into both sides of Levy's transactions with Madoff.

105.    *Sterling Equities*. Sterling Equities Funding Co. and its related entities ("Sterling Equities") were founded by Fred Wilpon and Saul Katz in the 1970s as a vehicle to develop and invest in real estate. Sterling Equities had a longstanding relationship with JPMorgan, and both Fred Wilpon and Sterling Equities were customers of JPMorgan's Private Bank. Sterling Equities was also a longtime customer of BMIS and its cash infusions of hundreds of millions of dollars helped keep the Ponzi scheme afloat. JPMorgan accordingly had unique visibility into both sides of Sterling Equities' transactions with Madoff.

**Other Relevant Entities**

106.    *Aurelia and Aurelia Finance*.  Aurelia Fund Management Limited ("Aurelia"), a company incorporated in Bermuda, owned 25% of Hermes and provided Hermes with necessary office facilities, equipment and personnel to enable Hermes to carry out its investment management function.  Aurelia Finance, the Swiss company that purchased and distributed JPMorgan's structured products, is the parent company of Aurelia.

107.    *Rafale Partners*.  Rafale Partners Inc. ("Rafale Partners") was a fund that invested in two BMIS feeder funds.  Stated differently, Rafale Partners was a sub-feeder fund into BMIS.  Equity Exotics' proposal included an investment in Rafale Partners, but that investment was never approved.

## JPMorgan's View of Madoff as Seen from Account Activity

108.    JPMorgan was well-positioned to see Madoff's criminal activity because JPMorgan had access to vast amounts of financial information about Madoff and BMIS.  It was apparent from the transactions in the 703 Account that Madoff was not using the account to buy or sell securities, which is virtually all BMIS was supposed to be doing through the IA Business.  Nor could Madoff's market-making or proprietary-trading businesses serve as cover for this account activity as those businesses would have also engaged in the purchase or sale of securities.  But instead of investigating the glaring absence of securities activity in what was purported to be BMIS's operating accounts, or in the JPMorgan accounts of BMIS's counterparties, JPMorgan allowed Madoff to move billions of dollars of stolen property for Madoff in and out of the 703 Account for well over a decade.

**The Importance of the 703 Account to the Life of the Ponzi Scheme**

109.    In order to run his Ponzi scheme, Madoff needed a bank account to provide his customers with a sense that he was operating a legitimate investment-advisory business.  Having a

bank account would allow Madoff to receive customer investments and then transfer that money out of the account to perpetuate the scheme.

110.     The 703 Account showed highly suspicious activity, including multi-million dollar transactions conducted by check, and inexplicable "roundtrip" patterns of multi-million dollar wire transfers between Madoff and certain of his customers.

111.     The unusual activity that was conducted in the 703 Account was visible to JPMorgan, which had to approve the negotiation of these large checks and wire transfers. Such activity required further investigation under relevant law and prudent business practices.  It should have triggered not only investigation by the banker in charge of the account, but should also have triggered the Bank's AML monitoring system.  Long before the passage of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("Patriot Act"), and with greater force after Congress passed the Patriot Act, banks such as JPMorgan were required to monitor their customers' transactions to detect and prevent money laundering and other suspicious activities.  The Patriot Act reinforced this obligation and underscored the importance of implementing robust detection systems.

112.     However, JPMorgan willfully blinded itself to decades of suspicious and inexplicable activity in the 703 Account, even when its monitoring system alerted JPMorgan to unusual activity. In return, JPMorgan earned hundreds of millions of dollars in revenue from its relationship with Madoff.  According to an academic study by Dr. Linus Wilson of the University of Louisiana, the balances in the JPMorgan account were so large that JPMorgan earned $907 million pre-tax from its Madoff deposits from 1986 to 2008.

113.     JPMorgan's willful blindness protected its valued relationships with some of the largest BMIS customers, particularly Levy, and allowed JPMorgan to collect revenue from these

relationships.  JPMorgan made money, Madoff made money, and the Ponzi scheme's largest enablers made money – while BMIS's customers, whose money was entrusted to JPMorgan, lost billions of dollars.

**The Establishment of Madoff's Account**

114.    Madoff opened the 703 Account at Chemical Bank in 1986.  Chemical Bank went through a series of mergers and acquisitions, becoming Chase and, ultimately, JPMorgan.[2]  As the Bank went through these transitions, Madoff's accounts stayed with it.  BMIS maintained a continuous banking relationship with JPMorgan and its predecessor institutions, including Manufacturers Hanover, Chemical Bank, and Chase, between at least approximately 1986 and Madoff's arrest on December 11, 2008.

115.    According to the Deferred Prosecution Agreement, between approximately 1986 and December 11, 2008, the 703 Account received deposits and transfers of approximately $150 billion, almost exclusively from BMIS investors.  The balance in the 703 Account generally increased over time, achieving balances of well more than $1 billion beginning in approximately 2005, and peaking at approximately $5.6 billion in August 2008.  Between August 2008 and December 11, 2008, billions were transferred from the 703 Account to customers of BMIS, leaving a balance of only approximately $234 million.

116.    According to the Trustee Complaint, Madoff and BMIS were assigned a relationship manager in the Broker/Dealer Group of the Investment Bank at JPMorgan.  In the mid-1990s, Cassa became their relationship manager.  He managed the Broker/Dealer Group's relationship with

---

[2]    In July 1996, Chemical Bank acquired The Chase Manhattan Bank, N.A. by merger and began offering banking services, including private banking, under the name The Chase Manhattan Bank.  In November 2001, The Chase Manhattan Bank acquired Morgan Guaranty Trust Company of New York by merger and began offering banking services, including private banking, under the name JPMorgan Chase Bank.

Madoff and BMIS, and was in charge of their accounts, including the 703 Account. When Cassa retired in March 2008, Mark Doctoroff took over as the Client Relationship Manager.

117. Despite JPMorgan's own understanding about Madoff's activities, which culminated in a report to the British authorities in October 2008, the 703 Account was still open and operating without any restrictions at the time of Madoff's arrest.

**JPMorgan Had a Duty to Know Its Customers**
**and to Monitor Its Customers' Account Activity**

118. The BSA, the Patriot Act, and New York laws and regulations require JPMorgan to file reports with appropriate regulators when it discovers suspicious activity by any of its customers. Such activity includes, *inter alia*, transactions where the Bank has a substantial basis for believing a criminal violation is occurring, transactions involving potential money laundering, and transactions that have no business or apparent lawful purpose or are not the sort in which the particular customer would normally be engaging. As alleged in detail herein, there were numerous suspicious transactions with Levy in the 703 Account that should have triggered investigations and reports to regulators. Nor did the 703 Account serve a legitimate business purpose, as money in that account was not used to purchase any securities. The only plausible explanation was that Madoff and/or BMIS were stealing from customers. According to the Deferred Prosecution Agreement, JPMorgan did not make any reports to federal or state regulators concerning suspicious activity in the 703 Account. Although there was no legitimate business purpose for the activity in the 703 Account, the 703 Account was never closed, which would have been consistent with reports to regulators for such egregious conduct.

119. The BSA, the Patriot Act and New York laws and regulations also required JPMorgan to maintain rigorous anti-money-laundering policies and procedures. Indeed, federal legislation and regulations have long required banks to have an AML program. One element of these programs is

monitoring customer account activity in order to detect possible fraud, money laundering, or other improper activity.  These requirements were first established by the BSA and federal banking regulations.  *See* 31 U.S.C. §5311; 12 C.F.R. §208.63.  All of the federal banking agencies have substantially identical requirements.  Those parts of JPMorgan under the supervision of the Office of the Comptroller of the Currency ("OCC") would thus have the same obligations.  The Patriot Act reinforced these obligations and underscored the importance of implementing robust detection systems to ensure that money launderers and terrorists would not be able to use the United States financial system to further their crimes.

120.    One purpose of these requirements is to ensure that banks, which are often in the best position to identify potentially illegal activity, will closely observe the transactions taking place in their clients' accounts.  The legislation and regulations also provide guidance to banks and other financial institutions regarding how to best achieve that goal, and what actions to take once suspicious activity is identified.

121.    Section 352 of the Patriot Act and the banking regulations require financial institutions to institute an AML program that includes four pillars: (i) designating an individual or individuals responsible for managing BSA compliance; (ii) a system of policies, procedures, and internal controls to ensure ongoing compliance; (iii) training for appropriate personnel; and (iv) independent testing of compliance.  *See* 12 C.F.R. §208.63.

122.    Financial institutions must also fully understand the business in which their customers are engaged.  This duty, referred to as the responsibility to "know your customer" ("KYC"), is critical to determining what activity was suspicious.  12 C.F.R. §208.62.  Institutions viewing account activity need a baseline against which to distinguish account activity that may be normal for a particular industry from account activity that might suggest an illegal enterprise.  The KYC duty

also pre-dated the Patriot Act.  Not only was it suggested by such guidelines as the Federal Reserve's

BSA Examination Manual of 1995 and Supervisory Letter on Private Banking Activities, SR 97-19

(SUP), but it was standard industry practice.

123.    This regulatory guidance directed financial institutions like JPMorgan to perform on-

site visits to their clients, obtain and review financial statements to corroborate the sources of the

clients' wealth, and to review media reports regarding their clients.

124.    It was also standard industry practice for financial institutions to perform KYC on

their clients.  Many financial institutions have entire departments devoted to this one task and to

making sure KYC is performed thoroughly and is constantly monitored and recorded.  JPMorgan has

a KYC department for each of its lines of business.

125.    While JPMorgan may have created AML and KYC programs that facially met the

requirements of the Patriot Act and related regulations, according to the Information filed by the

U.S. Attorney, JPMorgan failed "to maintain adequate policies, procedures, and controls to ensure

compliance with the BSA and regulations prescribed thereunder and to guard against money

laundering."

**JPMorgan's Board Was Ultimately
Responsible for Ensuring an Effective BSA/AML Program**

126.    During the relevant time period, JPMorgan's Board was ultimately responsible for

ensuring that JPMorgan maintained an effective BSA/AML internal control structure, including

suspicious activity monitoring and reporting.  The BSA/AML Examination Manual of the Board of

Governors of the Federal Reserve System explicitly places responsibility for BSA/AML compliance

with a corporation's board of directors:

> The board of directors, acting through senior management, is ultimately responsible
> for ensuring that the bank maintains an effective BSA/AML internal control
> structure, including suspicious activity monitoring and reporting. The board of

directors and management should create a culture of compliance to ensure staff adherence to the bank's BSA/AML policies, procedures, and processes. Internal controls are the bank's policies, procedures, and processes designed to limit and control risks and to achieve compliance with the BSA.  The level of sophistication of the internal controls should be commensurate with the size, structure, risks, and complexity of the bank. Large complex banks are more likely to implement departmental internal controls for BSA/AML compliance.

127.    JPMorgan's Board was not permitted to delegate to the Bank's executive officers the duty to ensure that JPMorgan maintained an effective BSA/AML internal control structure. According to the Federal Reserve Board's Commercial Bank Examination Manual, "The responsibility of directors to supervise the bank's affairs may not be delegated to the active executive officers or anyone else.  Directors may delegate to executive officers certain authority, but not the primary responsibility of ensuring that the bank is operated in a sound and legal manner."

**JPMorgan's Tools for Identifying Money
Laundering Among Broker/Dealer Clients**

128.    According to the Deferred Prosecution Agreement, the BMIS banking relationship with JPMorgan was handled by the JPMorgan Investment Bank's Broker/Dealer Group, which provided access to an array of banking services to approximately 200-250 broker-dealer clients. Each broker-dealer client had an assigned client executive (also known as a "relationship manager" or simply "banker") who was the primary point of contact for that client.

129.    Each relationship manager in the Broker/Dealer Group was required, pursuant to JPMorgan policy, to periodically certify that he had "(i) determin[ed], . . . on an ongoing basis, whether an existing . . . relationship complies with relevant legal and regulatory-based policies and meets the firm[']s corporate client standards, and (ii) [taken] appropriate action to identify, communicate and resolve any issue that may arise in the course of such determinations."  Client sponsorship also expressly "require[d] [the banker], as a Senior Officer of JPMorgan, to recertify on a periodic basis . . . that the necessary due diligence has been performed [and] that the client and its

subsidiaries continue to meet the JPMorgan corporate client standards in relation to any potential reputation risk."

130.    Following a restructuring of the Broker/Dealer Group in or about 2007, the JPMorgan employees providing various services to Broker/Dealer Group clients, such as credit or loan officers, were moved out of the Broker/Dealer Group and instead reassigned to other parts of the Bank.  As a result, client financial statements, regulatory filings, credit reviews, and other documents that had in the past been reviewed by the relationship manager were no longer regularly reviewed within the Broker/Dealer Group, although employees in JPMorgan's Credit department still reviewed such documents.

131.    JPMorgan also relied on a computerized system to comply with its AML obligations. Specifically, with respect to demand deposit accounts (*i.e.*, accounts holding client funds that can be withdrawn at any time, such as the 703 Account), JPMorgan employed different software tools commonly used by large financial institutions to monitor account activity.  Among other things, these software tools sought to determine how an account's activity compared to "peer" accounts and whether the account in question was behaving uncharacteristically for the peer group in terms of the value of the account and the volume of transactions.

132.    In the event that the computerized AML systems generated an "alert" for potentially irregular activity, JPMorgan policy provided that an AML investigations team within JPMorgan's compliance department would investigate the alert and take appropriate action, which could include contacting business people at the Bank, if any action was required.  The AML alert process operated independently of the client sponsorship process, and AML officers monitoring the alerts did not have immediate access to computerized information providing the identity of the relationship manager in the event that the AML officer deemed it appropriate to contact the relationship manager to

determine whether the alerted activity was consistent with the relationship manager's knowledge of the banking relationship.

133.    In addition, the AML investigations teams monitoring the alerts were expected to have access to the appropriate records about the client, including KYC material that JPMorgan maintained in connection with its BSA obligations and pursuant to bank policy.  The computerized AML system provided a means for AML investigators to review centrally maintained electronic copies of KYC materials.  However, JPMorgan's efforts to electronically store KYC materials were behind schedule and, accordingly, as set forth herein, on some occasions AML investigations teams responding to alerts were unable to access the computerized KYC material on the client as part of their investigation.

**The Use of JPMorgan's AML Tools
in Connection with the BMIS Account**

134.    According to the Deferred Prosecution Agreement, with respect to JPMorgan's requirement that a client relationship manager certify that the client relationship complied with all "legal and regulatory-based policies," Cassa signed the periodic certifications beginning in or about the mid-1990s through his retirement in early 2008, when the client relationship was assigned to Doctoroff.  In March 2009 – three months *after* Madoff's arrest – Doctoroff received a form letter from JPMorgan's Compliance function asking him to certify the Madoff client relationship again.

135.    During his tenure at JPMorgan, Cassa periodically visited Madoff's offices and obtained financial documents from BMIS in connection with periodic loans JPMorgan made to the firm.  Despite those visits and financial documents, and despite the fact that Cassa was aware of Madoff's standing in the industry, Cassa claimed to have a limited and inaccurate understanding of both Madoff's business, as well as the purpose and balance of the demand deposit accounts maintained by BMIS at JPMorgan.  According to the Deferred Prosecution Agreement, Cassa

believed that the 703 Account was primarily a BMIS broker-dealer operating account, used to pay for rent and other routine expenses. Cassa also believed that the average balance in BMIS's demand deposit account was "probably [in the] tens of millions." He claimed to not understand that the 703 Account was, in fact, the account used by Madoff's investment advisory business, and achieved balances of well more than $1 billion beginning in approximately 2005, and up to approximately $5.6 billion by 2008. Cassa stated that he recertified his sponsorship of the Madoff relationship each year because no adverse information about BMIS was brought to his attention.

136.    Doctoroff was a witness in the criminal trial of five of Madoff's former employees, *United States v. Bonventre*, Case No. 10-CR-228 (LTS) (S.D.N.Y. Nov. 7, 2013). Underscoring his utter failure to "know" the customer for whom he was responsible, Doctoroff testified that Madoff's account "was a relatively inactive account at the bank." In transitioning the Madoff account to Doctoroff, Cassa had explained to him that Madoff managed "some" money internally within the firm – "largely Madoff family money, firm money with a few outside clients" – but Doctoroff "wasn't aware that there was a formal investment advisory business."

137.    When asked if he had a sense of the scope of Madoff's investment business when he took over the account in early 2008, Doctoroff responded: "The way Rich described it to me, it was de minimus. It wasn't anything material."

138.    Despite JPMorgan's requirement that, as Madoff's client relationship manager, Doctoroff was obligated to certify that the client relationship with Madoff complied with all "legal and regulatory-based policies," Doctoroff never attempted to meet Madoff during the time period he was running the 703 Account. Doctoroff testified he "didn't see any reason to meet him" because he "knew there had been past meetings" with Madoff. Nor did Doctoroff exchange any letters, e-mails, faxes, or telephone calls with Madoff.

139.    According to the Deferred Prosecution Agreement, with respect to JPMorgan's computerized AML system, on two occasions the system generated "alerts" with respect to potentially suspicious activity in BMIS.  In January 2007, the 703 Account "alerted" because of unusual third party wire activity.  On the day of the alert, January 3, 2007, the 703 Account received $757.2 million in customer wires and transfers, 27 times the average daily value of incoming wires and transfers over the prior 90 days of activity, virtually all of which came from Madoff feeder funds that offered to invest funds from their own customers in BMIS.  In July 2008, the system alerted due to activity associated with Treasury bond redemptions.  In both cases, the AML investigators closed the alerts with a notation that the transactions did not appear to be unusual for the account in comparison to the account's prior activity.  In both cases, prior to closing the alerts, the investigators attempted to review the KYC file for BMIS but, upon receiving error messages to the effect that no file was available, did not conduct further investigation into the business of BMIS beyond a review of the company's website.

140.    As described herein, at various times between the late 1990s and 2008, employees of various divisions of JPMorgan and its predecessor entities raised numerous red flags of fraud at BMIS.  However, according to the Deferred Prosecution Agreement, at no time during this period did JPMorgan personnel communicate their concerns about BMIS to AML personnel in the United States responsible for JPMorgan's banking relationship with BMIS.  Nor did JPMorgan file any SAR in the United States relating to BMIS until after Madoff's arrest.

141.    Indeed, JPMorgan has admitted to the criminal failure of its AML program.  By entering into the Deferred Prosecution Agreement, JPMorgan consented to the filing of a criminal Information charging JPMorgan with failure to maintain an effective anti-money laundering

program.  The Information charges JPMorgan with a willful failure to establish an adequate AML

program:

> In or about 2008, in the Southern District of New York and elsewhere, JPMORGAN CHASE BANK, N.A., the defendant, did ***willfully fail to establish an adequate anti-money laundering program***, including, at a minimum,  (a) the development of internal policies, procedures, and controls designed to guard against money laundering;  (b) the designation of a compliance  officer to coordinate and monitor day-to-day compliance  with the Bank Secrecy Act and anti-money  laundering requirements;  (c) the establishment of an ongoing employee training program; and (d) the implementation of independent  testing for compliance conducted  by bank personnel or an outside party, to wit, JPMORGAN  CHASE BANK, N.A., failed to enact adequate policies, procedures, and controls to ensure that information  about the Bank's  clients obtained through activities in and concerning  JPMC's other lines of business was shared with compliance  and anti-money laundering  personnel, and to ensure that information about the Bank's clients obtained outside the United States was shared with United States compliance  and anti-money  laundering personnel. (Title 31, United States Code, Sections 5318(h) and 5322(a); and Title 12, Code of Federal Regulations,  Section 21.21.)  (Emphasis added).

142.    Commenting on the Deferred Prosecution Agreement, Preet Bharara, the U.S.

Attorney, said, "JPMorgan, as an institution, failed and failed miserably.  In part because of that

failure, for decades, Bernie Madoff was able to launder billions of dollars in Ponzi proceeds."

**Suspicious Transactions in the Madoff Account**
**Identified by JPMorgan Private Bank Predecessors**

143.    According to the Deferred Prosecution Agreement, beginning in the mid-1990s,

employees in the Private Bank for Chemical Bank, a predecessor of JPMorgan, identified a series of

transactions between the account of Levy[3] and accounts held by Madoff Securities, including the 703

Account.[4]  As one of the Bank's largest individual clients, with a portfolio valued (as of the mid-

1990s) at approximately $2.3 billion, Levy was highly valued by JPMorgan and its predecessors and

---

[3]    The Statement of Facts attached to the Deferred Prosecution Agreement refers to the "Private Bank Client," not Levy explicitly.  Upon information and belief, the Private Bank Client is Levy. Allegations in the Trustee Complaint, which explicitly refer to Levy, confirm that Levy is the Private Bank Client.

[4]    Levy maintained an account at the JPMorgan Private Bank until his death in September 2005.

was provided with his own office within JPMorgan's offices.  In addition, the Bank's Global Trust & Fiduciary Services business line served (along with Madoff) as co-executor and co-trustee of Levy's will, and stood to earn approximately $15 million in fee income upon his death.

144.    The Deferred Prosecution Agreement explains that the transactions between Madoff and Levy consisted of "round-trip" transactions which would typically begin with Madoff writing checks from an account at another bank ("Madoff Bank 2")[5] to one of Levy's accounts at JPMorgan and its predecessors.  Later the same day, Madoff would transfer money from his 703 Account to his account at Madoff Bank 2 to cover the earlier check from Madoff Bank 2 to Levy at JPMorgan.  And, in the final leg of the transaction, as known to JPMorgan, Levy would transfer funds from his JPMorgan account to the 703 Account in an amount sufficient to cover the original check he had received from Madoff at Madoff Bank 2.  These round-trip transactions occurred on a virtually daily basis for a period of years, and were each in the amount of tens of millions of dollars.  Because of the delay between when the transactions were credited and when they were cleared (referred to as the "float"), the effect of these transactions was to make Madoff's balances at JPMorgan appear larger than they otherwise were, resulting in inflated interest payments to Madoff by JPMorgan.

145.    In or around November 1994, an employee of JPMorgan's Private Bank drafted a memo stating that "the daily cost associated with" the overdrafts from the transactions is "outrageous," and documenting calls on November 29, 1994, in which the employee informed both Madoff and Levy that JPMorgan was aware of the activity and the fact that it allowed Madoff to earn interest on uncleared funds.  According to the memo, Levy responded that "if Bernie is using the float, it is fine with me, he makes a lot of money for my account."

---

[5]       Upon information and belief, Madoff Bank 2 is Bankers Trust.

146.     In or about 1996, personnel from Madoff Bank 2 investigated the round-trip transactions between Madoff and Levy.  As a result of that investigation, which included meeting with representatives of BMIS, Madoff Bank 2 concluded that there was no legitimate business purpose for these transactions, which appeared to be a "check kiting" scheme, and terminated its banking relationship with BMIS.  According to personnel from Madoff Bank 2, JPMorgan was notified of Madoff Bank 2's closure of Madoff's bank account.  In addition, although unknown to JPMorgan at the time, Madoff Bank 2 filed a Suspicious Activity Report ("SAR") in or about 1996 identifying both BMIS and Levy as being involved in suspicious transactions at Madoff Bank 2 and JPMorgan "for which there was no apparent business purpose."

147.     Despite actual knowledge of Madoff's scheme, JPMorgan's Private Bank did not file a SAR relating to the transaction activity between Levy and BMIS, or terminate its banking relationship with Madoff, or direct the parties to cease such transactions.  JPMorgan allowed Levy's suspicious transactions to continue, although JPMorgan did require Levy to reimburse JPMorgan for the interest payments that these transactions had cost the Bank.

148.     After Madoff Bank 2 closed the BMIS account in or about 1996, Levy and BMIS continued to engage in round-trip transactions, the sizes of which increased, entirely through JPMorgan accounts.  In December 2001 alone, Levy engaged in approximately $6.8 billion worth of transactions with BMIS – all between Levy's accounts at JPMorgan and the BMIS 703 Account – in a series of usually $90 million transactions.  These transactions continued through 2003.

149.     According to the Deferred Prosecution Agreement, JPMorgan Private Bankers did not report the round-trip transactions between Levy and BMIS to JPMorgan AML personnel.  After Madoff's arrest in 2008, JPMorgan AML personnel reviewed the activity and belatedly filed a SAR concerning the above transactions.

150.     During Plaintiffs' counsel's interviews with Madoff, Madoff explained that additional transactions between Levy and Madoff were also a concern of top-level JPMorgan executives. According to Madoff, Levy had a 90-day loan arrangement with Madoff that started in the 1970s when Levy experienced cash flow problems as a result of New York City's fiscal troubles.  Levy would borrow money from banks and invest with Madoff.  Levy wanted to structure the loans for 90 days because such short-term loans resulted in low interest rates for Levy.  Levy used Chase, Bank of New York, and Israel Discount Bank.  These loans went on for years, according to Madoff. Ultimately, Israel Discount Bank did not allow Levy to continue banking with them.

151.     According to Madoff, Levy's suspicious loan transactions with Madoff raised red flags of check kiting at JPMorgan predecessor Chase.  Madoff recalled that in 2000, Chase complained to Madoff about Levy's 90-day loans, asking if Levy could instead keep the loans open and just pay interest.  But Levy liked the idea of paying the loans back within the 90 days, so he insisted they be structured as 90-day loans that would be paid off every 90 days and then be re-issued.  The 90-day loans also showed a significant amount of activity to make it look like Levy was an active trader, which enabled him to deduct his loan interest for tax purposes.

152.     Concerned about Levy's 90-day loans, John Hogan, then-Chief Risk Officer of JPMorgan's Investment Bank, phoned Madoff while Madoff was in Florida and asked Madoff whether he could stop issuing the loans every 90 days because, Hogan said, it looked like Levy was kiting checks.  Despite Hogan's concern that Levy was kiting checks, JPMorgan did nothing to curb its business with Levy or Madoff.

**Questions About BMIS's Investment
Returns from JPMorgan's Private Bank**

153.     According to the Deferred Prosecution Agreement, in or about 1993, Levy requested that a senior investment officer (the "Senior Investment Officer") of the Private Bank of Chemical

Bank, a predecessor of JPMorgan, meet with Madoff, so that Levy could better understand how Madoff regularly generated consistent returns.  Along with a quantitative analyst (the "Analyst"), the Senior Investment Officer met with Madoff.  A memorandum from around the time of the visit reports that the Senior Investment Officer was "very comfortable" with Madoff, "his operation" and "the conservative, risk-averse investment approach" for Levy, and that the Analyst said "it is quite possible for top-notch investment advisors to make 20-30% annual returns through such short-term programs."  However, the Senior Investment Officer later explained that he and the Analyst could not understand how Madoff was able to generate such consistent quarterly returns for Levy despite historic volatility in the market, and therefore concluded that Madoff "might also have been smoothing out the returns" by sharing trading spreads and profits from the Madoff Securities market-making business with Levy.

154.    In or about 1998, the Private Bank conducted a review of BMIS because it had been extending credit to Levy to invest in BMIS.  The review reflected that, according to BMIS account statements, Levy's reported investments, the substantial majority of which were invested through BMIS, had increased from $183 million at the end of 1986 to $1.7 billion in early 1998 – an increase of 830% in 12 years.  The Private Bank also learned that Madoff reported consistently positive returns for Levy at all times, including through the October 1987 stock market crash and subsequent market corrections.

155.    In late 2007, JPMorgan Private Bank personnel also conducted due diligence on BMIS because there was sufficient interest in Madoff among the Private Bank's clients such that JPMorgan considered putting BMIS on its own "trading platform" – that is, to put some of the money that the Private Bank invested on behalf of its clients into BMIS.  However, the JPMorgan Private Bank was told that Madoff would be unwilling to meet with JPMorgan in connection with its

due diligence efforts. The JPMorgan Private Bank ended the due diligence process and did not place

BMIS on its trading platform. After Madoff's arrest, the Chief Investment Officer of the Private

Bank wrote to Private Bank customers that "we did not do business with the Madoff funds, having

never been able to reverse engineer how they made the money – the numbers didn't add up. . . ."

JPMorgan Private Bank personnel did not provide this information to JPMorgan AML personnel.

**Questions About BMIS's Investment**
**Returns by a JPMorgan Investment Fund**

156.    According to the Deferred Prosecution Agreement, Chase Alternative Asset

Management – the JPMorgan fund of funds open to institutional investors and which was part of the

Asset Management line of business – also considered placing BMIS on its platform in the late 1990s

and again in or about 2007. In connection with reviewing Madoff's reported returns in the late

1990s, one CAAM fund manager commented on approximately December 10, 1998, that BMIS

returns were "possibly too good to be true," and that there were "too many red flags" to proceed with

further due diligence." In 2007, JPMorgan's fund of funds again considered a Madoff investment,

and also discontinued the due diligence early on because the first stages of the process provided

"little additional insight as to the source of the [BMIS] returns" and because JPMorgan learned that

Madoff would not meet with JPMorgan personnel to answer their questions. In neither the late

1990s nor 2007 did JPMorgan fund managers provide this information to JPMorgan AML personnel.

**JPMorgan Had a Duty to Know What**
**Type of Business Madoff Was Operating**

157.    The first step in identifying suspicious activity is for a bank to determine what its

clients' normal business activities would look like. *See* Federal Financial Institutions Examination

Council BSA/AML Examination Manual of June 2005. This step can be accomplished in many

ways, including by meeting with the client and learning about the client's business, conducting on-

site due diligence visits to review the client's business operations, and reviewing the client's financial statements.

158.    One of the ways in which JPMorgan purportedly discharges its KYC duty is by assigning a sponsor to each account.  The sponsor becomes the person in charge of ensuring that the Bank has sufficient information about the client and the client's business to identify suspicious activity.  Cassa was JPMorgan's sponsor for the 703 Account through early 2008.

159.    In that role, Cassa received financial statements from BMIS on a regular basis.  These statements included FOCUS Reports.  During an interview with Plaintiffs' counsel, Madoff said he was required to send JPMorgan his firm's unredacted FOCUS Reports.

160.    According to Cassa, JPMorgan reviewed these FOCUS Reports.  Doctoroff testified that BMIS's FOCUS Reports would be logged in with JPMorgan's credit department, where the credit department would "financially spread them in a spreadsheet or they'd analyze them, look them over and then file them."  According to Doctoroff, he did not receive FOCUS Reports for most of his roster of clients, "but because I think this client [BMIS] had been an old client and Rich had been the banker for so long, the FOCUS reports actually came sometimes directly to me by mail, and I would just forward them on to the credit department."  Doctoroff said he occasionally looked at BMIS's FOCUS Reports just to make sure the firm was in good financial health.

161.    As detailed herein, the FOCUS Reports contained glaring irregularities.

**JPMorgan Knew of Inconsistencies Between BMIS's Financial Statements, the Activity in the 703 Account, and BMIS's Purported Business**

162.    According to the Trustee Complaint, JPMorgan possessed at least 15 regulatory filings of BMIS that revealed numerous inconsistencies and falsehoods.  These reports included two annual audited financial statements ("Annual Audited Reports") and 13 quarterly FOCUS Reports, which reported on periods between November 1, 2004 and September 30, 2008.  Upon information

and belief, Cassa began receiving quarterly FOCUS Reports from BMIS as early as October 2001, at the time the Patriot Act was passed.

163.    As a broker-dealer operating through 2008, BMIS was required under SEC Rule 17a-5 to file FOCUS Reports with the SEC.  These reports are basic financial and operational reports that set forth, among other information, assets, liabilities, revenues, and expenses of the company.

164.    During an interview with Plaintiffs' counsel, Madoff said that significant portions of a FOCUS Report were filed under seal, including the profit and loss sections.  The SEC and National Association of Securities Dealers ("NASD") (now FINRA) had access to the full FOCUS Reports.  According to Madoff, JPMorgan and other banks received BMIS's full FOCUS Reports, both the confidential and non-confidential portions, including the balance sheet and computation for reserve requirements for customer activity as required by the SEC under Rule 15c3-3.

165.    In addition, under SEC Rule 17a-5(d), BMIS was required to file Annual Audited Reports.  These Annual Audited Reports must contain information about income, cash flows, changes in stockholders', partners', or sole proprietors' equity, and changes in liabilities.  These reports are public, except where the statement of financial condition is bound separately from the balance of the Annual Audited Reports, in which case the balance is deemed confidential.

166.    Furthermore, when Equity Exotics began working with Cassa and the Broker/Dealer Group to conduct due diligence on Madoff and BMIS feeder funds in 2006 and 2007, Equity Exotics requested BMIS FOCUS Reports as part of the due diligence it conducted.

167.    According to the Trustee Complaint, James Coffman, from the Credit Risk Management department, specifically suggested that his team review the FOCUS Reports, stating in February 2006 that JPMorgan "should assess quality and detail of regulatory FOCUS Reports from the firm.  They are not necessarily audited, but we derive comfort knowing that regulatory reports

are presented to and reviewed by SEC and exchanges, and firms can be penalized significantly if statements prove to be fraudulent or inaccurate."

168.     In March 2006, Coffman stated again that JPMorgan should scan the FOCUS Reports to ensure that BMIS was not "another possible Refco."  The FOCUS Reports contained numerous discrepancies and fraudulent statements suggesting that BMIS was operating a Ponzi scheme.

169.     On January 25, 2007, Cassa acknowledged receipt of the FOCUS Report for the period of October l, 2006 through December 31, 2006 ("December 2006 FOCUS Report").  The December 2006 FOCUS Report revealed numerous inconsistencies and irregularities that would have been readily apparent to JPMorgan as BMIS's banker and that should have prompted further investigation of Madoff and BMIS by JPMorgan.

**JPMorgan Could Not Reconcile Madoff's FOCUS Reports with Levy's
Account Statements, and Confronted Levy and Madoff About Its Concerns**

170.     The FOCUS Reports and Annual Audited Reports that JPMorgan possessed did not reflect the activity that would be expected of a broker to its investment adviser accounts. BMIS's FOCUS Reports and Annual Audited Reports did not include: (i) customer receivables, such as margin accounts; (ii) customer payables, such as positive cash balances held by BMIS on behalf of customers; or (iii) a computation for reserve requirements for customer activity as required by the SEC under Rule 15c3-3, all of which would be reported by a broker-dealer with managed investment accounts.  The fact that BMIS's financial reporting was entirely inconsistent with the business in which it was purportedly engaging was readily apparent to JPMorgan as a result of the FOCUS Reports, and JPMorgan should have reviewed and investigated this inconsistency as part of its ongoing KYC duties.

171.     For example, according to the Trustee Complaint, the December 2005 FOCUS Report had no amounts recorded under the captions "Receivables from customers" and "Payable to

customers." In addition, the credit and debit balance amounts in customer security accounts that form the basis for the computation for the Rule 15c3-3 reserve requirement were left blank.

172.    The failure to report financial information demonstrating customer activity was not isolated to the December 2005 FOCUS Report. None of the FOCUS Reports and Annual Audited Reports in JPMorgan's possession – at least 15 in total – included customer receivables or customer payables, and none included customer account balances in their computations for 15c3-3 reserve requirements.

173.    The above facts, specifically that the FOCUS Reports and Annual Audited Reports that JPMorgan possessed did not reflect the activity that would be expected of a broker to its investment adviser accounts, corroborate what Madoff recounted concerning Defendants Shipley and Lipp during his personal interviews with Plaintiffs' counsel.

174.    During an interview with Plaintiffs' counsel, Madoff explained how his firm's FOCUS Reports actually alerted JPMorgan to his fraud. Indeed, according to Madoff, because of its visibility into the banking activities of Levy, only JPMorgan was in a position to know the discrepancies in his FOCUS Reports. Not even the SEC was in a similar position.

175.    Madoff said JPMorgan reviewed Levy's financial statements in connection with loan agreements that JPMorgan would enter into with Levy. Madoff said he also gave to JPMorgan Levy's brokerage statements, which showed billions in debit and margin balances, for credit purposes.

176.    According to Madoff, BMIS's FOCUS Reports did not show any accounts receivable or payable to customers, even though it was well-known to JPMorgan that he had huge amounts of debit margin balances due to his investment-advisory business. According to Madoff, anybody who saw his full FOCUS Reports would have questions. Indeed, JPMorgan had many.

177.    According to Madoff, JPMorgan relationship managers and risk officers, including Cassa and Hogan, periodically asked Levy why his debit balances were not reflected anywhere on Madoff's FOCUS Reports or income statements, asking for an explanation as to why the documents did not make sense.  Madoff explained that the FOCUS Reports and income statements reflected no items under customer-information lines.  JPMorgan found this unusual because the FOCUS Reports and income statements of a firm managing an investor's money – which JPMorgan believed Madoff was doing for Levy – should have reflected payables to, or receivables from, customers.

178.    Madoff explained that the actual reason he omitted customer payables and receivables from his FOCUS Reports was because he did not want the SEC to know he was managing investors' money.  If the SEC knew that, they would then ask where the non-existent securities of Madoff's investors were located.

179.    JPMorgan relationship managers asked Madoff about these discrepancies once per quarter.  According to Madoff, Levy and his accountant, Albert Maltz, were asked these questions by JPMorgan relationship managers, and Levy would ask Madoff how to respond.  Madoff told Levy he should not answer them.

180.    Eventually, after Madoff's and Levy's stonewalling, Defendants Shipley and Lipp inquired about the discrepancies between Levy's account statements and Madoff's FOCUS Reports/income statements.  According to Madoff, questions from these two senior JPMorgan executives about Madoff's discrepancies began in the 1990s with Shipley and continued through the 2000s with Lipp.

181.    As explained above, Shipley and Lipp previously worked closely together in the 1980s when Lipp, as President of Retail Banking at Chemical Bank, reported directly to Chemical's CEO Shipley.

- 49 -

182.     Madoff said that Shipley met him at Levy's office once or twice.  Madoff also said he

met with Lipp several times, recalling one meeting at the Four Seasons and another at Levy's office.

Madoff said he met with Lipp more often than Shipley because Lipp had a personal relationship with

Levy.  Madoff explained that Shipley and Lipp were focused on why Madoff's FOCUS Reports and

income statements showed no margin debit balances yet that type of investment activity showed up

on Levy's account statements.

183.     When Shipley or Lipp were having lunch with Madoff and Levy, they asked Levy

why his account statements and Madoff's FOCUS Reports and income statements did not match up.

According to Madoff, Levy blindsided them by responding that they should ask Madoff that

question.  Madoff responded that he would not disclose any client information and that Levy would

need to answer that question.  Levy retorted that he was going to take all his money out of JPMorgan

if they persisted with their line of questions.  Madoff recalled that Levy said, "I don't need you, I

have more money than you."

184.     According to Madoff, JPMorgan was petrified of Levy.  Levy would threaten Shipley

and Lipp with withdrawal of his money from the Bank, and Shipley and Lipp would "cower"

because Levy was such an important JPMorgan Private Bank customer.

185.     Madoff said Levy was famous for being blustery and excitable.  His threat to Shipley

and Lipp was "theater that he got a kick out of."  When Madoff was asked whether Levy questioned

Madoff as to why JPMorgan could not reconcile Levy's account statements with Madoff's FOCUS

Reports, Madoff responded that Levy "couldn't care less."

186.     Madoff's description of Levy's attitude to concerns about Madoff is corroborated by

Levy's response in 1994 to JPMorgan's concerns, explained above, about Madoff's use of the

"float" to earn interest on uncleared funds: "[I]f Bernie is using the float, it is fine with me, he makes a lot of money for my account."

187.    Madoff believes that JPMorgan was also intimidated by Madoff himself.  Madoff said that Cassa told him that he was one of JPMorgan's biggest clients, underscoring the importance to JPMorgan of preserving its relationship with Madoff.  According to Madoff, he had billions of dollars of Certificates of Deposit with JPMorgan at a time, and JPMorgan had $4 billion of commercial paper from Madoff.  JPMorgan's fear of angering Madoff is consistent with the fear, explained above, that Madoff engendered in the feeder funds, "where no one dares to ask any serious questions as long as the performance is good."

188.    For these reasons, and as further described herein, the FOCUS Reports were glaringly misleading, which was also obvious to others who reviewed them.  For example, shortly after Madoff's arrest, Robert Rosenkranz of Acorn Partners ("Acorn"), a fund-of-funds manager and an investment adviser to high net-worth individuals, reflected in an e-mail that Acorn had performed due diligence on Madoff and concluded "that fraudulent activity was highly likely."  ***Specifically, the e-mail stated that Acorn "reviewed the [BMIS] audit report . . . which showed no evidence of customer activity whatsoever, neither accounts payables to or accounts receivables from customers***."  (Emphasis added).

189.    Acorn succinctly described the indicia of fraud that led it to conclude years prior that Madoff was not legitimate, including the same indicia of fraud that concerned Defendants Shipley and Lipp and other JPMorgan executives who performed "due diligence" on Madoff:

> We had considered investing in a Madoff managed account, and decided to pass for reasons that give a useful insight into our due diligence process.
>
> First, we ascertained that the description of the strategy (purchase of large cap stocks versus sale of out of the money calls) appeared to be inconsistent with the pattern of returns in the track record, which showed no monthly losses.

Second, we persuaded a Madoff investor to share with us several months of his account statements with Madoff. These revealed a pattern of purchases at or close to daily lows and sales at or close to daily highs, which is virtually impossible to achieve. Moreover, the trading volumes reflected in the account (projected to reflect his account's share [of] Madoff's purported assets under management at the time) were vastly in excess of actually reported trading volumes.

Third, we noted that Madoff operated through managed accounts, rather than by setting up a hedge fund of his own. That was suspicious in as much as hedge fund fees are typically much higher than the brokerage commissions Madoff was meant to be charging. We suspected the requirement for annual hedge fund audits was the reason he wanted to avoid that approach. We knew that when his clients are audited, their auditors simply look at the account statements and transaction reports generated by the brokerage firm; they don't investigate the books of the brokerage firm itself.

Fourth, although brokerage firms are required to provide annual audit reports, the investor appeared not to have received any. With considerable perseverance, we obtained audit reports filed with the SEC, which were prepared by an utterly obscure accounting firm located in Rockland County New York.

***Fifth, we reviewed the audit report itself, which showed no evidence of customer activity whatsoever, neither accounts payables to or accounts receivable from customers. They appeared to be the reports of a market maker, not of a firm that at the time was meant to have some $20 billion of customer accounts***.

Taken together, these were not merely warning lights, but a smoking gun. The only plausible explanation we could conceive was that the account statements and trade confirmations were not bona fide but were generated as part of some sort of fraudulent or improper activity.  (Emphasis added).

190.    All of the information flagged by Acorn through proper, independent, and reasonable due diligence, was information that was known by JPMorgan.  JPMorgan was in possession of the unredacted FOCUS Reports and Annual Audited Reports that it reviewed as part of its KYC and AML duties, as well as part of its due-diligence process for its own investments linked to BMIS. Moreover, it had access to information not known to those such as Acorn – which accurately concluded that fraud was "the only plausible explanation" based on far less information than was available to JPMorgan – as a result of JPMorgan's visibility into the 703 Account and its knowledge regarding its own lending activity with BMIS.

**JPMorgan Was Also Aware of Anomalous Account Activity Between
Madoff and Levy that Was Inconsistent with BMIS's Purported Business**

191.    Much of the activity in the 703 Account occurred between Madoff and other JPMorgan customers.  Most notably, the party transacting with Madoff most often and in the largest dollar amount, receiving almost $76 billion in payments from the 703 Account between December 1998 and September 2005, was Levy.

192.    The activity in the 703 Account between Madoff and Levy, as well as other large BMIS customers, repeatedly exhibited textbook "red flags" and high-risk activity identified in the OCC's 2000 BSA/AML Handbook:

(a)    *Repetitive Transactions*: Madoff frequently engaged in repeated transactions with Levy, often on the same days, with no obvious purpose.

(b)    *Large Dollar Transactions*: The 703 Account reflected a pattern of large dollar transactions.  According to the Trustee Complaint, between 1998 and 2008, Madoff transferred nearly $84 billion out of the 703 Account to just four customers, including Levy.  These transactions represented over 75% of the wires and checks that flowed out of the 703 Account to BMIS customers.  It also was typical for Madoff, through the 703 Account, to enter into individual transactions with the BMIS feeder funds for hundreds of millions of dollars.

(c)    *Spikes in Activity*: The 703 Account showed occasional spikes in overall activity, which should have prompted further investigation by JPMorgan.  According to the Trustee Complaint, shortly before the beginning of the credit crisis, over the period beginning in the first quarter of 2006 and ending in the first quarter of 2007, there was a significant increase in the total dollar amount transacted in the 703 Account.  This increase in activity included a significant increase not only in third-party wires but also in book-transfer activity.  During this period, the average dollar amount of each transaction increased by over $60 million, from $17 million to $78 million.

(d)     *Wire Activity with Offshore Entities*: Through the 703 Account, Madoff frequently engaged in transactions with high-risk, offshore entities.  For example, according to the Trustee Complaint, between 2004 and 2008, the 703 Account's international wire transfers with high and medium risk jurisdictions accounted for 83% of the total dollar value of international wire transfers.

(e)     *Check Activity*: In addition, many transactions in the 703 Account involved hand-written checks totaling hundreds of millions of dollars in a single day.  This is not only unusual on its face, but it is particularly unusual given that BMIS would issue multiple checks on the same day to the same customer.  At the very least, this activity should have prompted a check-fraud investigation, which would have revealed more suspicious behavior.

(f)     *Private Banking*: The counterparties to many of these transactions were both BMIS customers and JPMorgan private-banking customers.  Private banking has long been considered a high-risk activity.  That is because private bank accounts generate lucrative fees, which provide an incentive for private bankers to ignore client activity that is illegal or violates internal bank policy.  Private banking has frequently served as a vehicle for money laundering, and particularly money laundering involving cross-border wire transfers.  Thus, when JPMorgan saw billions of dollars of transfers between the 703 Account and accounts held at JPMorgan's Private Bank, it should have been highly suspicious.  Moreover, given that those accounts were held by JPMorgan, the Bank had visibility into both sides of the transactions.  It had only to review its internal account records to determine whether there was a legitimate explanation for the transaction history.

193.    Madoff's transactions with two of BMIS's biggest customers – Levy and Sterling Equities – illustrate these irregularities.   According to the Trustee Complaint, of the top

15 counterparties to transactions with the 703 Account, 12 were feeder funds.  Two of the remaining counterparties were Levy and Sterling Equities.  Notably, both Levy and Sterling Equities were also JPMorgan private-banking customers, rendering both sides of their transactions with Madoff visible to JPMorgan.  These transactions were highly unusual and inconsistent with BMIS's purported business, and should have prompted investigation by JPMorgan.

194.    For example, during 2002, Madoff initiated outgoing transactions to Levy in the precise amount of $986,301 hundreds of times – 318 separate times, to be exact.  These highly unusual transactions often occurred multiple times on a single day.

195.    As another example, from December 2001 to March 2003, the total monthly dollar amounts coming into the 703 Account from Levy were almost always equal to the total monthly dollar amounts going out of the 703 Account to Levy.  There was no clear economic purpose for such repetitive transactions that had no net impact on Levy's account at BMIS.

196.    The two tables below illustrate the highly suspicious deposits and withdrawals into and out of the 703 Account by Levy from 1992 until his death in 2005.[6]

197.    The first table depicts the deposits and withdrawals into and out of the 703 Account *excluding* Levy's transactions:

**All Accounts Excluding Norman Levy Account 1L0027**

| Year | Cash In | Cash Out |
|------|---------|----------|
| 1992 | $904,272,560 | ($1,018,689,670) |
| 1993 | $664,370,878 | ($609,219,797) |
| 1994 | $577,959,780 | ($651,932,259) |
| 1995 | $884,907,897 | ($955,450,002) |
| 1996 | $1,303,802,139 | ($1,076,280,471) |
| 1997 | $1,995,752,125 | ($1,259,163,989) |

---

[6]    This data was compiled by Stephen Harbeck, President and CEO of SIPC, in response to a query from Congressman Scott Garrett, Chairman of the House Subcommittee on Capital Markets and Government-Sponsored Enterprises.

| | | |
|---|---|---|
| **1998** | **$2,718,098,944** | **($1,657,646,062)** |
| **1999** | **$2,606,597,014** | **($1,866,578,080)** |
| **2000** | **$2,584,913,116** | **($2,598,132,080)** |
| **2001** | **$2,309,389,766** | **($2,425,894,417)** |
| 2002 | $2,453,094,123 | ($2,664,015,048) |
| 2003 | $2,855,614,441 | ($3,423,072,194) |
| 2004 | $4,045,208,942 | ($3,477,761,846) |
| 2005 | $3,616,547,123 | ($4,767,292,175) |

198.   The second table reflects deposits and withdrawals into and out of the 703 Account

involving *only* Levy's account:

### Norman Levy Account 1L0027

| Year | Cash In | Cash Out |
|---|---|---|
| 1992 | $1,108,364,660 | ($994,048,201) |
| 1993 | $1,387,358,368 | ($1,517,903,726) |
| 1994 | $2,279,645,611 | ($2,128,805,955) |
| 1995 | $3,542,773,369 | ($3,453,047,453) |
| 1996 | $5,372,928,546 | ($5,471,231,206) |
| 1997 | $7,067,467,981 | ($7,377,869,833) |
| **1998** | **$10,102,787,010** | **($10,039,234,425)** |
| **1999** | **$15,316,343,975** | **($15,227,808,969)** |
| **2000** | **$23,044,584,696** | **($23,103,627,635)** |
| **2001** | **$35,095,634,103** | **($35,154,090,159)** |
| 2002 | $862,232,070 | ($898,796,993) |
| 2003 | $307,000,000 | ($246,934,119) |
| 2004 | $161,511 | ($49,478,915) |
| 2005 | $137,576 | ($35,629,433) |

199.   These tables make clear that, from 1992 through 2001, Levy's deposits and

withdrawals *by themselves* exceeded the deposits and withdrawals of all other Madoff accounts

*combined*.   Indeed, for most of those years, especially 1998 through 2001, Levy's deposits and

withdrawals exceeded all other accounts' deposits and withdrawals by several multiples.

200.   There was a huge spike in activity between Levy and the 703 Account in December

2001.  In that month alone, Madoff engaged in approximately $6.8 billion worth of transactions with

Levy.  Shortly thereafter, Levy's activity with the 703 Account decreased dramatically.

201.     In addition, the majority of Levy's transactions with the 703 Account were conducted by check.  For example, according to the Trustee Complaint, in December 2001, the 703 Account received checks from Levy, each in the amount of $90 million, on a daily basis – a pattern of activity with no identifiable business purpose.

202.     JPMorgan was acutely aware of Levy's close relationship with Madoff, identifying Madoff as "Levy's close friend and trader" who had helped increase Levy's wealth from $180 million in 1986 to $1.5 billion in 1998.

203.     Upon information and belief, JPMorgan never adequately investigated the connection between Madoff and Levy.  The activity in Levy's account confirmed that there was no legitimate explanation for the suspicious transactions in the 703 Account.  Although Defendants Shipley and Lipp, as well as Hogan, Cassa, and others at JPMorgan, confronted Levy and Madoff about the discrepancies between Levy's account statements and Madoff's FOCUS Reports and income statements, they never achieved resolution to their concerns.

204.     Rather than adequately investigating these transactions, JPMorgan was primarily concerned about maintaining a relationship with Levy and Madoff and maintaining a role in the Levy family's finances after Levy's death in 2005.  JPMorgan and Madoff were both designated executors of Levy's estate.  As alleged herein, JPMorgan prioritized its profit opportunities with Levy and Madoff over its compliance with regulations that required banks to monitor customer accounts.

205.     Also unusual were significant transactions between Madoff and Sterling Equities, another JPMorgan private banking customer.  According to the Trustee Complaint, Sterling Equities transacted more than $1 billion with the 703 Account.  Like Levy, Sterling Equities engaged in

multi-million dollar transactions with Madoff using checks, including depositing two $10 million checks with Madoff that both cleared the same day in 2005, each one coded by JPMorgan as "teller."

206.    JPMorgan profited not only from having the 703 Account, but also from its relationships with Levy and Sterling Equities, including the revenue it realized on their private banking accounts with JPMorgan.  No matter how inexplicable the transaction – hundreds of millions of dollars being punted between a private banking account and the 703 Account with no apparent economic purpose for either party, and multi-million-dollar transactions being conducted via a series of handwritten "teller" checks rather than a single wire transfer – JPMorgan executed the transactions, charged fees, reviewed the FOCUS Reports it knew to be false, and otherwise disregarded its obligations.

207.    Knowing that the activity in the 703 Account was not consistent with the purported business purpose of the account, and faced with evidence that illegal activity was occurring, JPMorgan had a duty to take action, not to participate in a breach of fiduciary duty, and to prevent the further theft of fiduciary assets.  As Madoff Bank 2 did when confronted with similar activity, JPMorgan should, at a minimum, have questioned Madoff and/or BMIS and, when it failed to receive a credible explanation for the bizarre activity, closed the account.

208.    Instead, JPMorgan took no action.  The 703 Account was still operating without any restrictions when Madoff was arrested on December 11, 2008.  JPMorgan did not convey its concerns to authorities or regulators other than British authorities in 2008 when it essentially admitted to having knowledge of Madoff's Ponzi scheme.  Had JPMorgan expressed its concerns to U.S. regulators at the time, as it was required to do pursuant to federal law, the Ponzi scheme would have been stopped years earlier.

**JPMorgan's Loans to Levy for BMIS Investments**

209.    In addition to the suspicious activity in the 703 Account, from at least 1996 through 2005, Levy and his children obtained credit facilities through JPMorgan and other banks, using funds borrowed under these credit lines to leverage investments with Madoff.

210.    According to the Trustee Complaint, in 1996, for example, the same year Chemical Bank acquired Chase, Levy had $188 million in outstanding loans, which he used to fund Madoff investments.

211.    JPMorgan referred to these investments as "special deals."  Indeed, these deals were special for all involved: (i) Levy enjoyed Madoff's inflated return rates of up to 40% on the money he invested with Madoff; (ii) Madoff enjoyed the benefits of large amounts of cash to perpetuate his fraud without being subject to JPMorgan's due diligence processes; and (iii) JPMorgan earned fees on the loan amounts and watched the "special deals" from afar, escaping responsibility for any due diligence on Madoff's operation.

**The FOCUS Reports Misrepresented BMIS's Cash at JPMorgan**

212.    The FOCUS Reports presented additional red flags of Madoff's fraud to JPMorgan that the Bank willfully ignored.  Both the FOCUS Reports and Annual Audited Reports require broker-dealers to list the amount of cash on hand at the broker-dealer, as well as all of its other assets and liabilities. BMIS's FOCUS Reports often did not show assets and liabilities that JPMorgan knew should have been reported, including: (i) cash held in JPMorgan accounts; (ii) loans provided to BMIS by JPMorgan; and (iii) related collateral on the loans JPMorgan extended to BMIS.

213.    BMIS consistently underreported the amount of cash it held on its FOCUS Reports – a fact that JPMorgan knew by virtue of its maintenance of the 703 Account.  On an almost nightly basis, JPMorgan swept funds from the 703 Account into overnight deposits.  Upon information and belief, for reporting purposes, the funds in the 703 Account and the overnight deposits are

considered "cash" and were visible to JPMorgan.  JPMorgan knew that the cash in the 703 Account and the overnight deposits often exceeded the "cash" reported by BMIS in its FOCUS Reports and Annual Audited Reports.

214.    For example, according to the Trustee Complaint, the December 2006 FOCUS Report listed $4,882,332 as the amount of cash on hand.  As of December 31, 2006, the ending balance of the 703 Account was $394,700 and the amount in overnight deposits was $295 million, totaling $295,394,700 of cash on hand.  From JPMorgan's view, there was a $290,512,368 difference between the amount of cash BMIS purported to have and the cash balances known to JPMorgan.  It thus was readily apparent to JPMorgan that BMIS was not reporting the full amount of cash it had on hand.  JPMorgan was uniquely positioned to discover and investigate this false statement by BMIS because it had access to the precise dollar amounts held in the 703 Account and overnight deposits.

215.    BMIS's underreporting of its cash position was not isolated to the December 2006 FOCUS Report.  According to the Trustee Complaint, in nearly every reporting period since December 31, 2006, BMIS's FOCUS Reports and Annual Audited Reports significantly underreported the amount of cash BMIS purported to hold, as compared to the amount BMIS actually held in the 703 Account and in overnight deposits.  JPMorgan was in possession of at least eight FOCUS Reports and two Audited Annual Reports between December 2006 and September 2008, providing it with numerous opportunities to discover that Madoff was underreporting BMIS's cash position and making fraudulent statements to the SEC.

**The FOCUS Reports Did Not Show JPMorgan's Loans to BMIS**

216.    Nor were irregularities and inconsistencies limited to the reporting of BMIS's cash position.  An entity filing a FOCUS Report must report "Bank loans payable."  JPMorgan made a loan to BMIS of $95 million in November 2005 that was not repaid until June 2006.  Yet, according to the Trustee Complaint, the FOCUS Report for the period ending December 2005 ("December

2005 FOCUS Report") – a report in JPMorgan's possession – reported that BMIS had no bank-loan obligations outstanding.  Based on its own information, JPMorgan knew this was false.

217.    Indeed, JPMorgan's $95 million loan to BMIS saved Madoff's fraud from imploding no less than three years before Madoff's arrest.  According to "The Wizard of Lies" by *New York Times* journalist Diana Henriques, the November 2005 loan to BMIS from JPMorgan "forestalled immediate disaster" for Madoff because at that time he was undergoing a cash crisis that pushed his fraud "right to the brink."  "Only some timely cash transfers from his legitimate business accounts and an eleventh-hour bank loan to his firm" – from JPMorgan – "forestalled immediate disaster."

**The FOCUS Reports Underreported BMIS's Loan Collateral**

218.    Madoff underreported BMIS's loan collateral, a fact also visible and known to JPMorgan.  The FOCUS Report must include "Securities and spot commodities owned at market value – U.S. and Canadian government obligations" and "encumbered securities."  JPMorgan's November 2005 $95 million loan to BMIS was collateralized by a $100 million Federal Home Loan Bank Bond.  Madoff should have reported the bond as "Securities and spot commodities owned at market value – U.S. and Canadian government obligations."  According to the Trustee Complaint, the amount reported on the December 2005 FOCUS Report, $72,232,950, was less than the $100 million of the value of the bond that JPMorgan knew BMIS to be holding.  Moreover, the December 2005 FOCUS Report should have listed the bond under "encumbered securities," which was left blank.  Again, on the basis of its own information, JPMorgan could determine that Madoff was falsely reporting BMIS's financial information.

**The FOCUS Reports Revealed Obvious Inconsistencies in BMIS's Purported Business**

219.    The FOCUS Reports and Annual Audited Reports revealed glaring inconsistencies with the business in which BMIS was purportedly engaged – a business that JPMorgan was required

to know as part of its KYC obligations.  As the broker to its investment adviser accounts, BMIS was expected to report commission revenue.  According to the Trustee Complaint, before September 2006, Madoff did not record any commission revenue on the FOCUS Report "Commissions" revenue line.  Nor did Madoff report commission revenue on BMIS's Annual Audited Reports before October 2006.  JPMorgan possessed at least seven FOCUS Reports and Annual Audited Reports filed before September 30, 2006, none of which listed any commission revenue.  Even a cursory review of the FOCUS Reports and Annual Audited Reports should have prompted an investigation by JPMorgan.

220.    BMIS registered with the SEC as an Investment Adviser in August 2006.  The FOCUS Reports and Annual Audited Reports filed by BMIS after that time included amounts listed for "Commissions."  JPMorgan possessed at least nine FOCUS Reports and Annual Audited Reports filed for periods including or after September 2006.  Comparing the revenue reported in the Annual Audited Reports for the fiscal years immediately before and after BMIS registered as an investment adviser demonstrates the significance of the newly reported commission revenue.  According to the Trustee Complaint, for the fiscal year ended 2005, Madoff reported no commission revenue at all.  By contrast, for the fiscal year ended 2007, Madoff reported $103,174,848 of commission revenue, which represented over 60% of total BMIS revenues for the year.  The sudden shift by Madoff to begin reporting commission revenue should have raised questions as to the change in the business and prompted further investigation by JPMorgan as part of its ongoing KYC duties.  Instead, JPMorgan ignored blatant misrepresentations in the FOCUS Reports in violation of its duties to monitor and understand the business of its customers.

221.    According to the Trustee Complaint, in the December 2006 FOCUS Report, Madoff reported $23,921,497 as the amount of commissions on transactions in exchange-listed securities

executed on an exchange. Other than commissions on transactions in exchange-listed securities, Madoff disclosed no other commission revenue on the December 2006 FOCUS Report. Specifically, Madoff reported no commission revenue for: (i) "Commissions on transactions in exchange listed equity securities executed over-the-counter," (ii) "Commissions on listed options transactions," and (iii) "All other securities commissions." Because BMIS's well-known trading strategy – of which JPMorgan was familiar based on the 2006 investigation by Equity Exotics – consisted of trading S&P 100 equities and options, JPMorgan should have expected Madoff to report commissions relating to options (whether they were listed or OTC), which he did not.

222.    Accordingly, JPMorgan was in a unique position to uncover the many inconsistencies contained in the FOCUS Reports and Annual Audited Reports. But it ignored falsehoods that were plain on the face of the FOCUS Reports and Annual Audited Reports, and in doing so, substantially assisted the Ponzi scheme.

**JPMorgan Fueled the Fraud with Loans to BMIS in 2005 and 2006**

223.    Shortly after Levy's death, JPMorgan began lending money directly to BMIS, using Federal Home Loan Bank Bonds extended to Madoff from Carl Shapiro – Madoff's longtime friend, BMIS investor, and JPMorgan private-banking accountholder – as collateral. JPMorgan conducted an inadequate credit review before extending the loans, opting instead to immediately begin earning interest.

224.    According to the Trustee Complaint, in November 2005, JPMorgan requested approval for a fully collateralized $100 million broker loan to BMIS. Shortly thereafter, BMIS borrowed $95 million from JPMorgan, which as previously described, BMIS and Madoff did not report in BMIS's FOCUS Reports.

225.    Also as previously described, at the time of the November 2005 loan, Madoff's fraud was pushed right to the brink due to a cash crisis he faced at that time. JPMorgan's $95 million loan

to BMIS forestalled immediate disaster for Madoff's Ponzi scheme – a full three years before the Ponzi scheme would ultimately come crashing down.

226.     According to the Trustee Complaint, Enrica Cotellessa-Pitz, a Controller for BMIS, requested the initial $95 million on BMIS's behalf in a letter sent to JPMorgan on November 14, 2005.  Before receiving the letter, Daniel Bonventre, BMIS's Head of Operations, had spoken with Evadney Sandiford in JPMorgan's Broker/Dealer Group regarding BMIS's large loan request.

227.     Cotellessa-Pitz requested that JPMorgan credit the 703 Account with the $95 million, and use a bond in another account that Madoff held with JPMorgan as collateral – account number xx3414 (the "Geoserve Account").

228.     The Geoserve Account contained a Federal Home Loan Bank Bond in the principal amount of $100 million, due April 8, 2009.  According to JPMorgan's records, the $100 million bond was "receive[d] free" from Shapiro on November 4, 2005.

229.     Madoff credited the value of the bond to a number of IA Business accounts held by Shapiro's family members, and, in addition, Madoff paid Shapiro approximately 30% interest on the bond.   Madoff paid the interest quarterly, depositing the payments into various accounts at JPMorgan held by Shapiro's family members.

230.     JPMorgan credited $95 million to the 703 Account on November 14, 2005 – the same day Cotellessa-Pitz requested the funds.  JPMorgan immediately began to earn money off of the loan, collecting $198,081.60 in interest for November 2005, and $374,062.50 in interest for December 2005.

231.     Quickly thereafter, Bonventre, on BMIS's behalf, requested an additional $50 million in a letter addressed to JPMorgan, dated January 18, 2006.  Similar to BMIS's prior loan request,

Bonventre directed JPMorgan to credit the 703 Account with the funds, using the bonds held in the Geoserve Account as collateral.

232.    That same day, on January 18, 2006, Bonventre sent an additional letter requesting JPMorgan to accept two more Federal Home Loan Bank Bonds into the Geoserve Account.  One bond was worth $9 million and the other was worth $45 million, together totaling $54 million.  As before, JPMorgan's records indicate that BMIS received these bonds "free" from Shapiro, yet Madoff paid an annual interest rate of approximately 30% on the securities to various Shapiro family customer accounts at JPMorgan.  In response to Bonventre's requests, JPMorgan credited the 703 Account with $50 million on January 23, 2006.

233.    With the loan to BMIS now increased by $50 million, JPMorgan reaped the benefits of that arrangement, collecting even greater amounts in interest.  JPMorgan collected substantial interest in connection with these transactions with Madoff: $443,689.23 for January 2006; $552,057.30 for February 2006; $620,781.25 for March 2006; $625,564.23 for April 2006; and $668,862.85 for May 2006.

234.    Having collected over $3.4 million in interest since BMIS's initial loan request on November 14, 2005, JPMorgan stopped accumulating profits on June 1, 2006.  On that date, Madoff sent a letter to JPMorgan requesting a decrease in BMIS's loan amount to zero, and authorizing JPMorgan to debit the $145 million principal amount of the loan from the 703 Account.  JPMorgan did as Madoff requested, and debited $145 million from the 703 Account that same day.

235.    As with most of JPMorgan's due diligence – or lack thereof – regarding Madoff, JPMorgan made no effort to determine the solvency or financial condition of BMIS before extending these loans.

236.     For instance, in a November 2005 credit memo that JPMorgan prepared requesting approval for a fully collateralized $100 million broker loan for BMIS, JPMorgan relied solely on BMIS's historical performance and Madoff's reputation in the community to find comfort in its exposure and conclude that BMIS would be able to repay the loan.

237.     Moreover, in summarizing BMIS's supposed financial stability in that memorandum, Raffale Cardone, a credit officer at JPMorgan, stated that BMIS's assets "are comprised primarily of broker-dealer receivables and securities inventory."

238.     Upon information and belief, JPMorgan again failed to conduct any independent investigation into BMIS's solvency or financial condition, relying exclusively on BMIS's unaudited financial statements in its April 2006 credit memo, stating: "As expected, [BMIS's] revenues were nearly entirely driven by trading income."

239.     Both credit memoranda's conclusions ran afoul of sound banking practices and JPMorgan's own policies, which mandate that financial analyses of the borrowing customer be based on audited financial statements.

### Willfully Ignoring the Evidence of Madoff's Ponzi Scheme, JPMorgan Invested in and Structured Products on BMIS Feeder Funds

**JPMorgan's Note Program**

240.     Despite more than a decade of concerns and suspicions surrounding Madoff's relationship with Levy that reached as high as the senior-most executives at JPMorgan, the Bank allowed Madoff's business to continue.  Indeed, by 2006, JPMorgan sought to *increase* its exposure to Madoff.  According to the Deferred Prosecution Agreement, beginning in approximately the spring of 2006, JPMorgan invested approximately $343 million of its own money in Madoff feeder funds as a hedge for structured products issued by JPMorgan's Investment Bank.  Those structured products were issued by JPMorgan in London in 2006 and 2007 through JPMorgan's Equity Exotics

Desk, a group that specialized in creating complex derivatives based on the performance of certain investment funds. The purpose of the products was to provide investors with "synthetic exposure" to hedge funds or other equities without the investor making a direct investment in the fund itself.

241. The Madoff-derivative products offered by JPMorgan generally worked as follows: JPMorgan issued notes (which it sold through various distributors) and promised to pay note-holders a return that corresponded to the return of a particular Madoff feeder fund. In order to hedge the risk created by those notes, JPMorgan then invested its own capital in the feeder fund directly. JPMorgan's investment of its own money in the Madoff feeder funds as a hedge position would therefore in large part offset the risks associated with JPMorgan's obligation under the notes. In this business model, JPMorgan's Investment Bank profited from transaction fees associated with issuing the notes, and endeavored to minimize risk resulting from these issuances. Due to the features of the JPMorgan-issued notes, however, it was impossible for JPMorgan to eliminate all risks from its exposure to Madoff feeder funds. For example, with respect to certain notes issued by JPMorgan that would pay the noteholder three times the Madoff feeder fund's investment returns, JPMorgan would suffer no losses if the Madoff feeder fund decreased in value by less than 33%, but could suffer substantial losses if the Madoff feeder fund's value fell to zero.

242. JPMorgan started its structured-product program by gathering information on Fairfield Sentry and Lagoon. According to the Trustee Complaint, by February of 2006, JPMorgan had already visited FGG in connection with due diligence. After the visit, Chen Yang, who worked in the Market Risk Management department, wrote:

> I do have a few concerns and questions: 1) All trades are generated by Madoff's black box trading model and executed by Madoff, It's not clear whether [FGG] has any discretion or control over the autopilot trading program. . . . 2) Is it possible to get some clarification as to how the fund made money during times of market distress? . . . how did they manage to get better than 3M T-Bill returns? . . . For

example, from April to September 2002, the S&P 100 Index is down 30%, cash yielded 1%, and the Fund was able to generate over 6% returns.

243.     Yang was told during the same due diligence visit that FGG would not provide a copy of Fairfield Sentry's trading agreement with BMIS.  Yang therefore relied solely on a verbal description of the investment guidelines and restrictions FGG had agreed upon contractually with BMIS.

244.     Andrea De Zordo and Marco Bischof, who worked in Credit Risk Management, noted similar concerns with respect to Lagoon, Hermes and Aurelia.  Bischof was surprised by the absence of a proper legal relationship between BMIS and Hermes, and wrote to De Zordo on November 11, 2006: "What continues to surprise me is the fact that after their 14 years in the business and $1.5bn AUM [assets under management], we seem to be the first 'investor' spotting this lack of documentation around Lagoon and it's [sic] upstream/downstream relationships."   De Zordo responded that the key question was whether JPMorgan as a firm should even be doing business with Hermes and Aurelia.

245.     About a week later, Bischof followed up with De Zordo after a call with Aurelia. He wrote: "They have position level transparency once a month with 1 week delay, but don't run risk analysis and don't have the know-how of how to do this. . . . It doesn't look pretty."

246.     JPMorgan already knew the identity of BMIS's auditor, Friehling, and had known the identity of the auditor for years. But, upon information and belief, it was not until early 2006 that JPMorgan performed even minimal due diligence on Friehling.  Coffman noted that "a quick check found that they [Friehling] are not registerred [sic] with the Public Company Accounting Oversight Board, nor are they subject to peer reviews from the American Institute of Certified Public Accountants.  Additionally, they have no website to provide background on their organization."

247.    Despite its suspicions, by early 2007, JPMorgan was exploring deals with other BMIS feeder funds – the Rye Funds and Thema.

248.    JPMorgan was eager to begin issuing structured products on BMIS feeder funds. After conducting only preliminary due diligence on these funds, and documenting concerns and red flags related to BMIS and these feeder funds, JPMorgan started structuring and issuing products tied to these feeder funds' returns.

**JPMorgan Started Structuring and
Issuing Products on BMIS Feeder Funds**

249.    According to the Trustee Complaint, by February 2007, JPMorgan already had over $65 million in BMIS-related products in the pipeline.  These products included a €5 million trade on Fairfield Sigma, two $25 million trades tied to Fairfield Sentry, and a $10 million trade on Thema.

250.    JPMorgan continued to structure additional BMIS-related products during the spring of 2007.  In March 2007, JPMorgan personnel were determining terms for deals on Fairfield Sentry, Fairfield Sigma, Herald, the Rye Funds and Thema.

251.    On March 9, 2007, the BMIS deals JPMorgan had in its pipeline totaled almost $100 million.  And by March 19, 2007, JPMorgan was considering another deal with the Rye Funds that would have increased the value of JPMorgan's BMIS-related products by $200-300 million.

252.    However, according to the Deferred Prosecution Agreement, JPMorgan required approval from the Investment Bank's Risk function in connection with its own investments in hedge funds, including the Madoff feeder funds.  Under pre-existing guidelines in place in 2007, approval for investments in so-called single-name hedge funds (like BMIS) was set at $100 million in risk exposure to JPMorgan (meaning, the total amount JPMorgan could be expected to lose if JPMorgan's investment lost virtually all its value).  Risk exposure above $100 million required approval from senior risk executives, with the level of approval depending on the size of the

proposed investment.  In assessing potential transactions that required individual approval from the JPMorgan risk function, risk officers assessed both "market risk" (*i.e.*, the risk associated with the investment performance of the underlying fund, assuming the fund followed its advertised strategy) and "credit risk" (*i.e.*, whether the fund could be trusted with JPMorgan's money).  In the context of hedge fund investments, one credit risk factor in all proposed transactions was the risk that the fund manager was committing fraud.  The scope of fraud risk ranged from a manager who deviated from a promised investment strategy to a manager who was reporting entirely fictitious returns.

**JPMorgan's Limited Due Diligence Led to Unanswered,
Disturbing Questions About Madoff and His Investment Strategy**

253.    In 2007, with hundreds of millions of dollars in deals ready to close, JPMorgan needed to get more comfortable with its exposure to Madoff.  JPMorgan needed to conduct additional "enhanced" due diligence on each of these BMIS feeder funds and, most importantly, on BMIS directly.  According to the Trustee Complaint, on February 15, 2007, Coffman wrote: "I would classify [BMIS feeder funds] as a single fund, and therefore assume it falls under the $100mm limit. . . . Without actually getting to do due diligence on Madoff, I don't think we should consider going above that limit."

254.    Equity Exotics started by looking within its own company.  Madoff and his family had maintained numerous accounts at JPMorgan or its predecessors since as far back as 1986.  As Equity Exotics was in the midst of structuring hundreds of millions of dollars of BMIS-related products, it contacted BMIS's Client Relationship Manager in the Broker/Dealer Group, Richard Cassa.  Cassa offered to arrange a conference call between representatives of the Investment Bank and Madoff.  On March 30, 2007, Cassa and members of JPMorgan's Risk Management Division spoke with Madoff.

255.   Even though the products JPMorgan was structuring would have led to increased investments in the BMIS feeder funds, and therefore increased investments through BMIS, Madoff explained that he disliked banks structuring products on his strategy.  In particular, he made clear that he was not willing to engage in "full due diligence."  Despite the potential benefit for BMIS of growing its customer base, Madoff could not risk allowing serious due-diligence inquiries as that would reveal his Ponzi scheme.

256.   During an interview with Plaintiffs' counsel, Madoff explained how JPMorgan's due diligence personnel would deal with his refusal to engage in full due diligence.  Madoff said that in the mid-to-late 2000s, Carlos Hernandez, the Head of Global Equities at JPMorgan's Investment Bank, requested a due-diligence visit with Madoff.  Madoff told Hernandez that he did not want to meet with Hernandez to engage in due diligence.  In an effort to be able to say that he literally met with Madoff in Madoff's office, Hernandez asked Madoff if they could just meet in the elevator bank of Madoff's offices.  Madoff agreed; but when they actually met in the elevator bank, they kept on getting interrupted by the flow of BMIS employees through the elevators.  Eventually, Madoff found this to be absurd and invited Hernandez to come into a conference room to talk.  But according to Madoff, it was not really a due-diligence meeting, as Madoff spoke to Hernandez for just a few minutes and only discussed basic information about his investment strategy.  Madoff thought it was ridiculous that Hernandez was willing to accept such limited due diligence just so he could say he literally met with Madoff in Madoff's office.

257.   Having learned relatively little from speaking to Madoff, Equity Exotics reached out to the BMIS feeder funds themselves to obtain additional information about the funds and BMIS.

258.   JPMorgan began its investigation with Tremont.  According to the Trustee Complaint, on April 11, 2007, representatives of JPMorgan met with Tremont's CEO, Bob

Schulman, to discuss the Rye Funds and BMIS.  Shortly after the meeting, JPMorgan sent Tremont a list of additional questions regarding BMIS.   A number of these questions related to the counterparties to BMIS's OTC options trading.  JPMorgan asked whether BMIS entered into the trading agreements on behalf of Tremont or in BMIS's own name, and whether Tremont knew who the counterparties were.  JPMorgan received a response that required more due diligence.  Tremont responded that, even though Tremont was the party entering into these agreements with the options counterparties, it did not know who the counterparties were.   Upon information and belief, JPMorgan never verified any of Tremont's responses with third parties, or questioned the source of Tremont's information about the counterparties.

259.    Based on the limited due diligence JPMorgan performed on BMIS through Tremont, Equity Exotics put together a "Transaction Approval Package."  In addition to seeking approval for a number of different transactions involving the Rye Funds, the proposal summarized JPMorgan's due diligence.  "We will be receiving full transparency on the program via trade statements from BLM, albeit on a delayed basis, and will be able to verify our risk analysis on an ongoing basis," Equity Exotics claimed, and "[t]he liquidity of the underlying portfolio, even assuming close to $15 billion in 'AUM' at Madoff, should be adequate to fully unwind the program without catastrophic slippage."  The risk involved was noted and quickly dismissed based on nothing more than Madoff s reputation:

> Although SIPC, SEC and NASD regulation on segregated customer accounts should protect us from financial distress at BLM, it would not necessarily protect us from wholesale malfeasance or fraud. That said, BLM has had a successful operating history for nearly 50 years and Bernie Madoff is [a] well regarded figure in this industry.

260.    JPMorgan received similar responses to questions posed to Herald regarding counterparties: (i) the trades were between the fund and the counterparty, not between BMIS and the counterparty; (ii) the fund received collateral from all counterparties "except from very few high

quality parties"; and (iii) "the fund trades with say 10+ names at any moment in time," but Madoff was not willing to disclose the actual names of the counterparties.

261.    Tremont and Herald's responses were particularly alarming given Madoff was purportedly entering into OTC agreements with the options counterparties on behalf of the funds. Tremont and Herald, and, upon information and belief, all of the other BMIS feeder funds, thus were supposedly entering into contracts with third parties whom they could not even identify, much less assess counterparty creditworthiness.

262.    Again, despite alarming answers from Herald, Equity Exotics put together another "Transaction Approval Package" entitled "Bank Medici AG – an access provider into the Bernie Madoff strategy."  As key transaction strengths, Equity Exotics listed: "multiple layers of oversight – although relying solely on Madoff for position level information, independent weekly and monthly valuations are carried out by Bank Medici and the third party Administrator," and "[p]ersonal relationship with Sonja Kohn," "[a]ccess to as secretive a business as Madoff's, and the loyalty he presumably he [sic] feels towards her adds significant comfort."  Key transaction weaknesses included that "investors, sub-Custodians, auditors etc. rely solely on Madoff produced statements and have no real way of verifying positions at Madoff itself," and "[f]raud – given the significant reliance on BLM for verification of assets held, and no real way to confirm those valuations, fraud presents a material risk."

263.    JPMorgan representatives also visited Rafale Partners and Bank Medici, and were able to review BMIS feeder funds' customer, option and trading agreements.  Through that review, JPMorgan learned that only certain feeder funds had agreements that explained BMIS's trading strategy.  JPMorgan suggested that the BMIS feeder funds may be hesitant to press for more details because they did "not want to upset the relationship with Madoff."

264.    JPMorgan did not put its securities activities on hold to conduct due diligence on the funds.   Rather, at the same time it was conducting these investigations, Equity Exotics was structuring additional BMIS-related products with little-to-no regard for the disturbing information learned through its due diligence.

265.    Furthermore, despite these indicia of a Ponzi scheme, in June 2007, JPMorgan proceeded to prepare a $600 million proposal for additional investments in the Rye Funds and a $225 million proposal for investments in Herald.

266.    Following these proposals, Coffman was anticipating "a major head on collision with the business that wants to do an infinite amount of this activity with much less oversight." A full "collision" did not seem to occur.   Concerns about potential misconduct at BMIS tempered only the *amount* that JPMorgan was willing to risk with BMIS feeder funds, but not the underlying decision to invest in those funds.

**Undeterred by Evidence of a Ponzi Scheme, Equity
Exotics Requested Approval from the Hedge Fund Underwriting
Committee to Issue Approximately $1 Billion in BMIS-Related Products**

267.    Despite the results of its cursory due-diligence inquiries, on June 15, 2007, Equity Exotics presented a proposal to the HFUC requesting approval of "an overall BLM Strategy risk limit" that would carry a maximum potential exposure of $1.32 billion, a significant increase from the $100 million pre-existing investment limit in single-name hedge funds.   According to the Deferred Prosecution Agreement, because of the size of the proposed risk exception, the Investment Bank's Chief Risk Officer, John Hogan, required the proposal to be presented to the HFUC.   The HFUC, chaired by Hogan, was comprised of executives from various of JPMorgan's lines of business who were affected by transactions involving hedge funds.   The decision whether to permit the requested risk exception rested ultimately with Hogan.

268.     According to the Trustee Complaint, this proposal included products ranging from $33 million to $667 million with eight different BMIS feeder funds and sub-feeder funds, including the Rye Funds, Thema, Herald, Fairfield Sentry, Fairfield Sigma, Lagoon, and Rafale Partners.  The majority of the products were anticipated to come from transactions associated with the Rye Funds. Despite asking to structure $667 million worth of products around the Rye Funds, Equity Exotics explained in the proposal that Tremont had "no internal risk system in place to aggregate positions daily."  Equity Exotics also stated: "[W]e were unable to validate how this manual process [of checking trades] is performed, but feel reasonably confident that it is effective in terms of capturing major discrepancies."

269.     Equity Exotics was not seeking approval to *begin* issuing products on BMIS feeder funds.  Rather, Equity Exotics was asking for permission to continue issuing these products in ever larger amounts.  By the time Equity Exotics submitted this proposal, it had already executed over $130 million in trades based on Fairfield Sentry, Fairfield Sigma, and Lagoon.  With the June 2007 proposal, Equity Exotics was requesting approval to issue an additional billion dollars of structured products, an amount the group acknowledged was in "significant excess of both individual as well as aggregate single manager limits" for hedge fund investments at JPMorgan.

270.     The proposal was submitted with a certain sense of urgency.  At the time it was submitted, Equity Exotics had already arranged for $540 million worth of transactions to close at the end of June 2007.

271.     According to the Deferred Prosecution Agreement, in advance of the meeting, credit executives circulated written materials analyzing the proposed Madoff transaction.  Among other things, those written materials described BMIS as being a fund "in the order of $15-20bn" – making it one of the largest hedge funds then in existence.

- 75 -

272.     With respect to risk analysis, the written materials stated that there was little market risk associated with Madoff's investment strategy, and concluded that "the main risk this trade poses is systemic fraud risk at the BLM level."  Elsewhere, the materials reiterated that "[c]learly, our largest risk is that of wholesale fraud at BLM that would strip the firm of any real assets (balance sheet or customer)."  The written materials reported that the prospect of a systemic fraud was "extremely unlikely."  The written materials also reported that systemic fraud risk was further mitigated because even "under a fraud/insolvency event at BLM level JPM would be a senior creditor (together with other account holders of customer assets also protected by SIPC and should have priority in recovery above other creditors of BLM.  It would therefore require a fraud/insolvency event of extreme proportions to erode the implied subordination in the JPM transactions (e.g. estimated $15bln of assets run by BLM . . .)."

273.     The presentation also made clear that although JPMorgan was able to conduct due diligence on some of the Madoff feeder funds, Madoff was unwilling to allow JPMorgan to conduct direct due diligence on BMIS.  The presentation materials did report that JPMorgan personnel had spoken to Madoff by telephone on March 30, 2007.  During this call, Madoff provided what JPMorgan employees considered to be forthcoming answers to questions posed about Madoff's purported investment strategy, but indicated that he did not approve of the Madoff-linked derivative products and would not allow JPMorgan to conduct due diligence on his fund directly.

274.     The June 15, 2007 HFUC meeting ended without Hogan's approval for any further exposure by JPMorgan to BMIS.

275.     According to the Trustee Complaint, later the same day, shortly after the HFUC meeting ended, Hogan had lunch with another JPMorgan executive, Matt Zames.  Hogan sent an e-mail to his colleagues stating that, according to Zames, it was well-known that Madoff may be

operating a Ponzi scheme: "For whatever its worth, I am sitting at lunch with Matt Zames who just told me that **there is a well-known cloud over the head of Madoff and that his returns are speculated to be part of a Ponzi scheme** – he said if we Google the guy we can see the articles for ourselves – Pls do that and let us know what you find."  (Emphasis added).

276.    Hogan warned: "[Y]ou will recall that Refco was also regulated by the same crowd [SEC, NYSE, NASD] and there was noise about them for years before it was discovered to be rotten to the core.  Hopefully this is not the case here but given Matt's view, I think we owe it to ourselves to investigate further."  And in another e-mail several days later, Hogan wrote to one of the co-CEOs of the Investment Bank that Zames "told me Madoff has a very shady reputation in the market."

277.    Nevertheless, Equity Exotics seemed eager to receive approval, and the further research on Madoff appears to have been limited to a Google search with no follow-up.  Jane Buyers-Russo, head of the Broker/Dealer Group, asked one of her colleagues to "please have one of the juniors look into this rumor about Madoff that Hogan refers to below."  The analyst forwarded an article about a proposed change in SEC regulations that would eliminate a loophole in the regulations governing broker-dealers.  He speculated the loophole allowed broker-dealers to run "a '[P]onzi' scheme of sorts."  But Zames told Carlos Hernandez that he believed his recollection was of a *Wall Street Journal* article from 2002 and therefore eliminated the possibility that the analyst's explanation based on a recently-proposed regulatory change was correct.

278.    Neither Hogan nor anyone else at JPMorgan actually located the article to which Zames had referred.  According to the Deferred Prosecution Agreement, the article referenced by Zames was a 2001 *Barron's* feature entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum."  The *Barron's* article, among other things, raised some of the same issues identified by JPMorgan's risk analysts.  For example, it noted that BMIS had

"produced compound average annual returns of 15% for more than a decade," and that "some of the larger, billion-dollar Madoff-run funds have never had a down year."  The article then reported that "some on the Street have begun speculating that Madoff's market-making operation subsidizes and smooths his hedge-fund returns" and described how such smoothing could be accomplished through an unlawful practice known as front-running.

279.    According to the Trustee Complaint, Hogan cautioned: "Mr. Madoff will not allow us to conduct any due diligence on him directly and we are forced to rely on the diligence of third parties. . . . I told Bobby [Magee] and Neil [McCormick] we don't do $1 bio [billion] 'trust me' deals and we need to do our own due diligence on Madoff or this wasn't going to happen."

280.    According to the Deferred Prosecution Agreement, on or about June 27, 2007, the head of the Investment Bank's structured products group e-mailed Hogan a "quick reminder" that JPMorgan had "client trades requiring $150 mm of delta to buy in funds investing in Madoff on Friday of this week" and that there would be "further significant flows at next month end."  Hogan then requested and received additional information from the Broker/Dealer Group about BMIS, including information from its credit reviews.  On the same day, Hogan also spoke by telephone to Madoff, who, according to the Deferred Prosecution Agreement, answered questions asked by Hogan.  At the same time, according to the Deferred Prosecution Agreement, Hogan understood that Madoff would not authorize any further direct due diligence on BMIS.

281.    Later the same day, June 27, 2007, Hogan wrote "we will approve up to $250 mio [million] for these trades," then clarified that he was approving $250 million of total risk exposure, to include both JPMorgan's existing approximately $105 million in exposure as well as exposure generated through new transactions by the Investment Bank.  Based on the decision to set risk

exposure at $250 million, the Equity Exotics Desk ended its discussions related to other potential Madoff derivative transactions then under negotiation in order to stay within the risk limits.

282.    During Plaintiffs' counsel's interview of Madoff, Madoff recalled this phone call with Hogan.  According to Madoff, Hogan did not even mention the BMIS-related structured products because Hogan knew Madoff did not like them.  Madoff said Hogan only spoke to him about business in general.

283.    Thus, the only further "diligence" that appears to have been done by Hogan was a banal phone call with Madoff, which was enough to reassure Hogan to permit $250 million worth of "trust me" deals.

284.    According to the Trustee Complaint, when asked how he made the decision to approve $250 million of exposure to BMIS, Hogan explained that, in essence, he simply closed his eyes and guessed:

> [T]here's no math or magic around it – you know, a lot of what we do is more art than science, so I would like to tell you that I have prepared a model that told me 250 is the optimum number, but – you know, that's not the way it works in reality, and so I just use my best judgment to come up with that number.

**The Investment Bank Continued to Turn a**
**Blind Eye to Clear Evidence of the Ponzi Scheme**

285.    For the remainder of 2007, Equity Exotics' enthusiasm for BMIS-related transactions remained strong despite uncovering additional evidence about Madoff, BMIS, and BMIS feeder funds.

286.    According to the Trustee Complaint, in August 2007, while analyzing information provided by Herald, De Zordo noted that despite Treasury bills rallying, "the move does not justify the magnitude of the gain that Bank Medici is claiming."

287.    According to the Deferred Prosecution Agreement, in approximately August 2007, an Equity Exotics employee ("Equity Exotics Banker 1") conducted an analysis in order to determine

the relationship between returns reported by a Madoff feeder fund and the investments in S&P 500 stocks and Treasury bills that Madoff claimed comprised his investment strategy. Equity Exotics Banker 1 was unable to determine based on available information how the Madoff feeder fund could have produced these returns had Madoff followed this strategy, writing that the market performance during the period analyzed was "far away" from the returns that Madoff "allegedly made." After obtaining further information and conducting further analysis, Equity Exotics Banker 1 e-mailed a colleague that he did "take comfort from the fact" that two separate Madoff feeder funds were reporting close to the same returns for the period.

288.    According to the Trustee Complaint, only three months later, Equity Exotics expressed skepticism about the information provided by the Fairfield, Lagoon, and Herald feeder funds. In November 2007, De Zordo and Nikolakopoulos were organizing quarterly calls to funds to which JPMorgan had substantial exposure. These funds included Fairfield, Lagoon, and Herald. When arranging meetings with these funds' managers, Nikolakopoulos emphasized that they needed to meet with managers from all three funds in order to "assess what the returns where [sic] driven from and ensure we get a consistent answer from all three."

289.    Also in the fall of 2007, according to the Deferred Prosecution Agreement, JPMorgan hired a "Head of Due Diligence" for the Equity Exotics Desk.[7] On his first day on the job, the head of the Equity Exotics Desk directed the Head of Due Diligence to review the Madoff feeder fund positions and offer any insight into how Madoff was able to generate his purported returns. The Head of Due Diligence was unable to explain the returns and learned that the Equity Exotics Desk was no longer interested in issuing products linked to the returns of Madoff Securities.

---

[7]      Upon information and belief, the Head of Due Diligence is Luke Dixon.

290.    Despite these concerns, JPMorgan remained committed to doing business with Madoff – the potential upside reward for investing through Madoff was simply too good to pass up despite JPMorgan's concerns of a Ponzi scheme and other misconduct.

291.    In March of 2008, JPMorgan acquired The Bear Steams Companies Inc. ("Bear Stearns"). Bear Stearns' share price began to precipitously drop and the company began suffering from an extreme liquidity crunch in early March 2008. Unable to borrow enough funds to save itself, Bear Stearns started looking for outside options. On March 13, 2008, Bear Stearns' CEO contacted JPMorgan's CEO, Defendant Dimon. By March 16, JPMorgan had entered into an agreement to purchase Bear Stearns. JPMorgan started integrating the two businesses almost immediately.

292.    The integration involved combining business units and risk exposures across JPMorgan and Bear Stearns. In acquiring Bear Stearns, JPMorgan had significantly increased its hedge-fund exposure. In order to bring its hedge-fund exposure back within JPMorgan's internal limits, JPMorgan began to review its exposure and look for places to make cuts. According to the Trustee Complaint, this reduction process prompted JPMorgan to revisit and reconsider certain other hedge-fund transactions, including its transactions involving BMIS feeder funds.

293.    By June of 2008, JPMorgan had approximately $150 million invested in Herald. These were direct investments by JPMorgan in the fund, presumably to hedge the Bank's exposure on its structured products tied to Herald's returns. When JPMorgan learned that its main contact at Bank Medici, Andreas Pirkner, was departing, JPMorgan scheduled a meeting with Pirkner, his replacement, Andreas Schindler, and a handful of other individuals from Bank Medici. This meeting was crucial given JPMorgan's ongoing struggle to get information from Bank Medici even with an

established contact.  The JPMorgan team, which included Scott Palmer and Luke Dixon, was sent to Vienna on July 7, 2008, to perform a "very thorough refresh" of its initial due diligence.

294.    Following this meeting, JPMorgan downgraded Herald's risk rating to the lowest rating of "5-E."  Palmer noticed aspects of Herald's operation that caused him to direct JPMorgan to verify that Herald's assets actually existed at BMIS.  In hopes of gaining more transparency on Bank Medici and BMIS, JPMorgan scheduled a follow-up meeting with Kohn for July 10, 2008.

295.    The meeting with Kohn proved to be equally disappointing for JPMorgan.  Following this meeting, JPMorgan affirmed Herald's recently downgraded due diligence rating of 5-E. JPMorgan found that Kohn did not provide credible responses to a number of questions related to the managed accounts Bank Medici had with BMIS.  Given that Kohn was the only person at Bank Medici to have "any relationship of substance" with Madoff or BMIS, it was incredibly troubling and telling that even she could not provide adequate responses to JPMorgan's questions.

296.    According to the Deferred Prosecution Agreement, on June 23, 2008, after reviewing e-mails about the failure of one of the feeder funds to provide information to JPMorgan,[8] including about how the money sent to Madoff was invested, and the departure of various feeder fund employees, a senior Equity Exotics banker e-mailed the head of the Equity Exotics Desk: "How much do we have in Madoff at the moment?  To be honest, the more I think about it, the more concerned I am."

297.    The lack of credible responses JPMorgan received from BMIS feeder funds in 2008 was reminiscent of the answers JPMorgan received in 2007.  The only difference between JPMorgan's due-diligence efforts in 2007 and 2008 was that, in 2008, JPMorgan continued to investigate.  But as it had the previous year, JPMorgan kept its findings a secret.

---

[8]     Upon information and belief, the feeder fund was Herald.

298.    According to the Trustee Complaint, in September and October of 2008, in light of its increased hedge-fund exposure in the wake of its acquisition of Bear Steams and in view of the deteriorating economy, JPMorgan commenced an "exposure health check."  This health check required JPMorgan to conduct broad due diligence on all BMIS feeder funds in which it had invested or on which it had structured products.  Palmer's team contacted the managers of Lagoon, Hermes, Fairfield Sentry, Fairfield Sigma, and Herald, as well as a number of fund custodians.

299.    Despite its previous investments in BMIS-related funds, JPMorgan now urgently requested the following information: (i) each BMIS feeder fund's net asset value, both at the end of the first quarter and as of the date of the request; (ii) any visible redemptions currently in the pipeline; (iii) whether the fund's liquidity profile experienced any changes; (iv) whether the fund's service providers experienced any changes or events, specifically at BMIS; (v) whether BMIS experienced any changes or events; (vi) whether the account documents between BMIS and its feeder funds had been modified in any way; and (vii) the percentage of fund assets represented by structured products.  Upon information and belief, anticipating that a number of the BMIS feeder funds would be less than forthcoming with information, JPMorgan requested the BMIS feeder funds' availability for follow-up questions.

300.    JPMorgan was asking many of the same questions it had asked more than a year before.  And as before, JPMorgan received incomplete and evasive answers.  The BMIS feeder funds repeatedly found creative ways to dodge questions about their knowledge of Madoff and BMIS.

301.    FGG evaded answering questions about counterparties by stating that the funds were currently in Treasury bills, so there were not (at that particular point in time) any counterparties.

302.    When JPMorgan asked Bank Medici to provide risk reports in or around April 2008, Kohn agreed to share the reports.  Nearly four months later, however, Kohn had not provided the

reports and claimed that the parties needed to sign a confidentiality agreement first.   A confidentiality agreement was unnecessary, given that information from the risk reports would be communicated via JPMorgan's "Measure Risk."   Measure Risk, a leading risk-and-quantitative-analytics provider to institutional hedge-fund investors, maintained confidentiality by only providing JPMorgan with summary exposure and risk statistics.   The confidentiality attained by the use of Measure Risk was explained to Bank Medici when it initially agreed to provide risk reports.

303.   Instead of continuing to be blinded by the potential reward of investing with BMIS, this time, the JPMorgan due-diligence team sought additional answers.   The team met with Kohn and Amit Vijayvergiya, the Head of Risk Management at FGG, in October 2008. Following those meetings, Palmer circulated notes to his colleagues summarizing his findings.

304.   Palmer acknowledged: "Fairfield claims to have seen the 19th floor [where Madoff executed his proprietary trading strategy] but judging from the lack of thoroughness of some of their other due diligence I am not entirely convinced that Madoff allowed them to actually enter the trading area."   When Palmer asked Vijayvergiya how BMIS's trade information was put into the order entry system, Vijayvergiya told Palmer that "he did not know and did not ask."   These answers by Vijayvergiya revealed that BMIS feeder funds knew very little about Madoff s operations and were extremely reluctant to push Madoff for answers.

305.   This meeting also forced JPMorgan to again acknowledge the fact that none of the funds knew who the counterparties were to their own options contracts.   They relied solely on Madoff's oral assertions that he dealt with 15-25 counterparties, that he strictly monitored the risk level of each counterparty, and that the counterparties posted collateral for the put options.   Indeed, Vijayvergiya openly admitted that "Madoff refused to disclose the list of counterparties."   Vijayvergiya explained: "Madoff claimed that they did not want to disclose the list of counterparties

- 84 -

because they are worried that if the list gets into the market that the counterparties would group together and either steal Madoff's strategy or otherwise somehow work against Madoff." Kohn, on the other hand, conceded that she had never even thought to ask Madoff who the counterparties were, and she was reluctant to ask him about it now.

306.   JPMorgan was also reminded that BMIS's auditor was Friehling – information it had for years as Madoff's and BMIS's banker. Palmer noted that this was an "odd choice" and questioned whether such a small firm was even competent to conduct an audit of an investment firm with "$650m in shareholder capital." Despite Palmer's surprise, this was not the first time that JPMorgan had access to such information. As early as 2006, for example, Coffman conducted due diligence on Friehling and, in October 2007, one of JPMorgan's own investors had inquired about the identity of BMIS's auditor. JPMorgan conducted no investigation beyond learning the names of BMIS's auditor. Had JPMorgan looked further, it would have learned that Friehling was actually a three-person shop (and one of the three was retired or semi-retired) located in a strip mall in Rockland County, New York – a truly odd choice for a multi-billion dollar investment enterprise and a red flag of fraud.

307.   Had JPMorgan followed up on these facts sooner and expressed its concerns to regulators, the Ponzi scheme would have been stopped sooner.

308.   JPMorgan was again told that there was no independent process for confirming that the trades were executed or that the assets existed. BMIS acted as the sub-advisor, sub-custodian, and broker-dealer to the BMIS feeder funds. The "reconciliation" process that occurred between the funds' actual custodians, the funds' administrators, and the funds themselves could be described as follows: "Effectively all three parties receive a faxed confirmation from Madoff of the day's

positions/trades and enter them into their system.  The reconciliation is thus effectively one of data entry integrity as there is no reconciliation of source data to third parties."

309.    According to the Trustee Complaint, Palmer summarized his observations: "It's almost a cult [Madoff] seems to have fostered."  Neither Kohn nor Vijayvergiya had been concerned by the lack of information Madoff provided. Rather, "they seem[ed] very defensive and almost scared of Madoff.  They seem[ed] unwilling to ask him any difficult questions and seem[ed] to be considering his 'interests' before those of the investors."

310.    JPMorgan's findings were especially troubling, given that earlier that month, in October 2008, Tom Petters had been arrested under suspicion of operating a $3.5 billion Ponzi scheme. Dixon, in response to Palmer's notes summarizing his meeting with Kohn and Vijayvergiya, drew parallels between Petters and Madoff. He pointed out that they could not just rely on a long history and trust in an investment adviser, a mistake that investors with Petters were now regretting. In the face of the Petters fraud, Dixon suggested: "Let's go see Friehling and Horowitz the next time we're in NY . . . to see that the address isn't a car wash at least."

311.    JPMorgan knew the critical questions to ask to avoid a situation like the Petters Ponzi scheme. In fact, JPMorgan had asked such questions in 2007 and 2008. Unfortunately, it was not until late 2008 that JPMorgan was willing to admit that "[t]he 'DD' done by all counterparties seems suspect."

312.    Further, JPMorgan's own due diligence in 2008 revealed: (i) lack of transparency; (ii) resistance on Madoff's part to provide meaningful disclosure; (iii) involvement of Madoff's family throughout BMIS; (iv) lack of effective due diligence and monitoring by the BMIS feeder funds; (v) fear of Madoff, which prevented investors from asking any serious questions as long as

performance was strong; (vi) lack of an independent and competent auditor; and (vii) unanswered questions regarding BMIS's trading, as no one outside of Madoff understood how it was done.

313.     These red flags were the same red flags JPMorgan discovered when it conducted its first round of due diligence more than a year before.  JPMorgan chose then to ignore the red flags, and instead continued to structure and issue products that facilitated an investment of approximately $250 million in BMIS feeder funds.

314.     Again faced with this overwhelming evidence of a scam, Palmer belatedly suggested that it was a mistake for JPMorgan to "rely[] on Madoff's integrity (or Fairfield and Medici's belief in Madoff's integrity) and the quality of the due diligence work (initial and on-going) done by the custodians . . . to ensure that the assets actually exist and are properly custodied."  In an effort to provide some level of comfort to himself and fellow JPMorgan employees, Palmer noted that "if some[thing] were to happen with the funds, our recourse would be to the custodians and whether they had been negligent or grossly negligent."

### Faced Again with Numerous Indications of Madoff's Ponzi Scheme, JPMorgan Quietly Redeemed All of Its Assets from the BMIS Feeder Funds

315.     According to the Trustee Complaint, in or about September 2008, a troubling conversation took place between Alain Krueger and representatives of Aurelia Finance.  JPMorgan had sold its structured products to Aurelia Finance, who in turn had sold the products to its clients. During the call, Krueger explained that JPMorgan was going to be redeeming from Lagoon.  The Aurelia Finance representatives repeatedly opposed JPMorgan's plan.   At two points in the conversation, the Aurelia Finance representatives threatened Krueger, referring to "Colombian friends" who could "cause havoc" and telling Krueger "we know where to find you."

316.     As a result of this conversation, JPMorgan sent a document to the United Kingdom's SOCA conveying the substance of the threats.  This document also explained why JPMorgan had

chosen to redeem its interests in BMIS feeder funds: JPMorgan knew Madoff was not operating a legitimate business.

317.    In a letter to SOCA, JPMorgan's Vice President for the United Kingdom, Rebecca Smith, wrote:

> Ultimately, the bank reached the same conclusion it had reached during its initial due diligence efforts in 2006 and 2007; JPMorgan was unable to obtain look through transparency at the Feeder Fund level, did not have access to the identities of the counterparties to Madoff's OTC options, did not fully understand the relationship between the broker-dealer and the investment advisor, and noted the fact that the custodians did not actually hold the assets.

318.    JPMorgan sent a Suspicious Activity Report to SOCA.  The document, dated October 28, 2008, reads:

> JPMCB's [an acronym for "JPMorgan Chase Bank"] concerns around Madoff Securities are based (1) on the *investment performance* achieved by its funds which is so *consistently and significantly ahead of its peers*, year-on-year, even in the prevailing market conditions, as to appear too good to be true – meaning that it probably is; and (2) the *lack of transparency* around Madoff Securities' trading techniques, the *implementation of its investment strategy*, and the *identity of its OTC option counterparties*; and (3) its unwillingness to provide helpful information. *As a result, JPMCB has sent out redemption notices in respect of one fund, and is preparing similar notices for two more funds*.  (Emphasis added).

319.    However, JPMorgan did not file any SAR with U.S. regulators relating to Madoff until after Madoff's arrest, for which failure JPMorgan was criminally charged by the U.S. Attorney.

320.    According to the Trustee Complaint, on or about October 10, 2008, JPMorgan submitted requests to redeem approximately $13 million from Fairfield Sentry and €15 million from Fairfield Sigma.  Later that month, JPMorgan requested redemptions totaling $154 million from Herald and an additional €72 million from Fairfield Sigma.

321.    JPMorgan also repeatedly rejected requests from clients to structure additional products tied to BMIS during the fall of 2008, each time relying on the fact that the funds at issue were invested with BMIS.

322.     Following these redemptions, JPMorgan was careful not to discuss with third parties its redemptions from BMIS-related products or its decision to cease any new involvement with BMIS.   Instead, when approached by clients that had an interest in BMIS-related products, "[w]ithout disclosing too much, [JPMorgan] got rid of all the Madoff feeder[s]" from clients' lists of potential investments.

323.     In November 2008, Dixon stated: "[O]nly limited information has been historically available on anything related to Madoff.  We have done some work but this served only to reinforce the fact that we don't have enough access to Madoff to render independent judgment." As a result, JPMorgan was attempting to divest itself of all of its BMIS-related investments.

324.     JPMorgan's exit strategy was successful.   By the time Madoff was arrested, JPMorgan had managed to redeem all but $35 million of its BMIS feeder-fund investments, due in large part to the fact that its request to redeem its shares of Lagoon in late November had not yet been satisfied.

325.     In redeeming its investments in the BMIS-related funds, JPMorgan left itself fully exposed with regard to its structured products.   JPMorgan was still required to pay its investors based on the returns generated by the BMIS feeder funds, which were generating positive returns while the market was down.  But for JPMorgan's evidence about Madoff's scam, this move would have been counterintuitive.  However, JPMorgan suspected trouble with Madoff and quietly pulled out its money.

**JPMorgan Considered Extending a**
**$200 Million Loan to BMIS in Mid-November 2008**

326.     Although JPMorgan sent an SAR to the U.K. authorities on October 28, 2008, ***little more than two weeks later*** the Bank seriously considered extending a $200 million loan to BMIS – which was twice the internal pre-approval limit for how much BMIS could borrow.

- 89 -

327.    Doctoroff confirmed that around November 17, 2008, BMIS made a request to borrow up to $200 million against U.S. Treasuries for a short-term period, either a night or a couple of nights, to provide some liquidity while the firm covered some other settlements.  Doctoroff said BMIS's pre-approved internal borrowing limit was $100 million.  After discussing the reason for the loan request with BMIS's Daniel Bonventre, Doctoroff relayed that information to JPMorgan's credit department, which was responsible for deciding whether to grant or deny the loan.

328.    Doctoroff testified that, to his knowledge, the loan ultimately never happened.  However, he understood the loan never happened because BMIS did not pursue the loan any further – not because JPMorgan said no.  Doctoroff testified that, in his opinion, "[b]ased on what we knew about the firm at the time and based upon the collateral," the loan to BMIS probably would have been extended by the Bank.

329.    Less than a month later, Madoff was arrested.

### After the Fraud Was Revealed, JPMorgan Admitted Knowledge of Red Flags that Madoff Was Not Legitimate

330.    In the immediate aftermath of Madoff's arrest, JPMorgan made a number of comments demonstrating its actual knowledge of red flags of Madoff's fraud.  According to the Trustee Complaint, Palmer admitted Madoff's "[r]eturn seems a little too good to be true." The day of Madoff's arrest, McCormick stated:

> We've got a lot wrong this year but we got this one right at least – I said it looked too good to be true on that call with you in Sep. Despite suspecting it was dodgy I am still shocked to see this happen so suddenly. I guess it's true that when the tide goes out you see who is swimming naked.

McCormick's criticisms of Madoff were in stark contrast to comments he had made in June 2007 following Hogan's decision to execute $250 million of business across products referencing BMIS.  Upset that the amount approved was not higher, McCormick complained that "it sometimes feels very hard to make money."

331.    The candid comments continued as various individuals at JPMorgan stated matter-of-factly that it was "statistically impossible" for BMIS to have generated 1.25% returns every month for years.

332.    Dixon admitted that he was not surprised to learn Madoff was not legitimate. Additionally, Palmer admitted that the Madoff Ponzi scheme "wasn't completely unexpected but the scale of it is still a shock."

333.    Even Hogan was relieved, noting that "Bobby F-ing Magee wanted to do $1bio of [BMIS-related products] and we made it $200mio – thank God."

334.    Cox acknowledged that JPMorgan's limited documentation on Aurelia violated basic KYC concepts:

> This document[ation] alone, irrespective of what's happen [sic], is probably a fireable offence based on my own KYC training.

> Marco told me last night he objected to dealing with Aurelia as there was no transparency, which maybe [sic] the reason for the statement in the document. I looked at Aurelia's website www.aurelia.com and they are prohibited from dealing with customers from US, UK, Switzerland and Bermuda. Now that's a red flag!

335.    Brian Sankey, Deputy Chief Risk Officer, best summarized JPMorgan's knowledge of the fraud and fear that JPMorgan's knowledge would be revealed following Madoff's arrest when he stated, in reference to the June 15, 2007 meeting agenda for the HFUC where Equity Exotics requested approval to increase JPMorgan's risk limit for BMIS-related transactions to over $1 billion: "Perhaps best this never sees the light of day again!!"

336.    Despite having knowledge of Madoff's scam, JPMorgan chose to keep its knowledge private.   JPMorgan approached BMIS feeder funds and asked for them to keep JPMorgan's redemptions quiet.   On December 17, 2008, Nikolakopoulos e-mailed FGG's Vijayvergiya to set up a call to discuss "[c]onfidentiality in relation to investments or disinvestments by JPMorgan and any of its affiliates in the two funds ([FGG] Sentry and Sigma)."

337.     JPMorgan stated that while many of its Private Bank customers had invested with BMIS, "luckily we didn't place any there."

338.     Indeed, JPMorgan's Private Bank had made a conscious and informed decision to avoid doing business with Madoff.  Following exposure of Madoff's scheme, JPMorgan's Michael Cembalest, Chief Investment Officer at J.P. Morgan Global Wealth Management, distributed an e-mail to Private Bank clients that commented on the Madoff situation.  Cembalest told investors the Private Bank chose not to invest with any BMIS feeder funds because it had "never been able to reverse engineer how they made money" and BMIS "did not satisfy [its] requirement for administrative oversight."

339.     Cembalest provided a lengthy list of red flags that had informed the Private Bank's decision not to invest: (i) Madoff served as his own prime broker, custodian, and investment adviser; (ii) Madoff utilized a three-person accounting firm in Rockland County, which was "almost unheard of for a fund of that size;" (iii) while the Madoff feeder funds were audited by large, well-known accounting firms, those audits did not cover BMIS; (iv) the Private Bank's due-diligence team was not allowed to meet Madoff; (v) Madoff did not charge fees for his money-management services (essentially leaving billions of dollars on the table); (vi) the volatility of Madoff's returns was only 2.5% over the preceding 17 years, a period which included some of the most volatile capital markets in history; and (vii) Madoff's fund "lost money in only 2 of 214 rolling quarterly periods since 1990."

340.     Cembalest also noted his suspicion after hearing Madoff speak at a conference in October of 2007, where Madoff had stated: "In today's regulatory environment, it's virtually impossible to violate rules."  Cembalest concluded that this type of attitude was the reason "why hedge-fund due-diligence is more than just looking at volatility and return patterns."

341.    Cembalest conceded that these "Oz-like signals . . . were too difficult to ignore." True, yet it was Cembalest's own company that allowed Madoff to launder billions of dollars for decades.

**JPMorgan's "Lessons Learned"**

342.    According to the Trustee Complaint, on December 19, 2008, JPMorgan's IBRC held a meeting at which Chen Yang and Richard Wise presented a "postmortem of the Madoff transactions."

343.    Yang and Wise's presentation included a chronology of the events surrounding JPMorgan's investments in BMIS.  They began by explaining how Equity Exotics had requested approval from the HFUC to increase JPMorgan's risk limit for Madoff-related transactions to over $1 billion – a request that "far exceeded the IBRC approved single HP limit of $100mm."  They then recounted how a conference call with Madoff had been arranged in an attempt to gather due-diligence information, but during the call Madoff "clearly expressed his dislike of doing structured products on his strategy and would not accommodate any direct due diligence on his firm."

344.    Both the positives and negatives of Equity Exotics' risk-limit request were considered.  The postmortem prepared by JPMorgan in December 2008 stated the following:

> Cons: *[T]he lack of ability to do a full due diligence on Madoff itself*;
>
> *[T]he potential risk of fraud given the strategy was managed by Madoff in customer brokerage accounts*.  This risk of fraud given the structure & set-up was correctly identified and flagged, but was considered at the time to be a remote likelihood given the Equity Exotics business sponsorship of the deal, sponsorship of Madoff by ICM and JPM's long standing (though limited) credit relationship with Madoff; and
>
> *Inability to reconcile Madoff's returns with ostensible strategy*; alpha generation dependent on "black box" timing model: Risk modeled the split strike conversion strategy, confirmed its benign market risk but could not replicate the fund returns and suspected that alpha may have been generated by front-running via the market-making. Risk consequently request a background check – but nothing showed up. (Emphasis added).

345.    JPMorgan nevertheless approved Madoff exposure in the amount of $250 million –
despite the strong risk of fraud and suspicions that Madoff was engaged in illegal front-running.
JPMorgan redeemed most of its Madoff-related investments before his arrest.  As of December 11,
2008, JPMorgan had only $35 million in risk exposure to Madoff feeder funds, having previously
redeemed approximately $276 million.

346.    Yang and Wise's presentation ended with a summary of lessons learned and red flags:

Lessons Learned:      *How much to bank on reputation and SEC regulation*:
                      Reliance on Madoff's long standing reputation, 40yr of [sic]
                      track record and good standing as a regulated entity. At what
                      level of notional risk does the possibility of fraud at a private,
                      unrated custodian outweigh the potential profitability of the
                      transaction?

                      Reliance on third party due diligence is insufficient and risky;

                      More rigorous background check on Madoff could have
                      revealed additional red flag[s] such as the questionable
                      auditor used by Madoff;

                      Fraud is possible even on an unprecedented scale and
                      longevity; and

                      Having risk transparency, control over assets and liquidity via
                      a managed account platform greatly mitigate fraud risk.

Red Flags:            *No Transparency*: No transparency on the blackbox timing
                      model implemented by Madoff;

                      *Unexplainable Returns*: Consistently smooth returns and low
                      volatility appear too good to be true. . . . Risk had concern on
                      whether Madoff's prop trading activities were appropriated
                      [sic] Chinese Walled from its market making business;

                      *Secrecy and Exclusivity*: No direct due diligence and
                      mystique of exclusive relationship with long standing clients
                      only. Madoff's dislike of structured products;

                      *U[nu]sual Business Model*: commission based revenue
                      instead of fee based revenue despite of the consistent double
                      digital [sic] returns year over year;

- 94 -

*Restricted Information Access*: JPM could only review sample trade tickets and trading agreements with Madoff during onsite visit with access funds, but was not able to obtain written copies of these documents; and

*PPM Risk Disclosures*: fund assets are exposed to credit risk of the sub custodian and primer [sic] brokers.

347.    The December 19, 2008 meeting minutes indicated that "[g]iven the red flags and lessons learned, the group agreed that going forward we should not do business with any client or counterparty – either directly or indirectly – who will not provide basic due diligence, without exception."

348.    In the aftermath of Madoff's arrest, JPMorgan conducted an internal investigation related to its relationship with Madoff and BMIS.  According to the U.S. Treasury Department, JPMorgan conducted internal interviews of more than 90 JPMorgan employees.

## JPMorgan Allowed the Ponzi Scheme to Continue

349.    Evidence of Madoff's Ponzi scheme permeated every facet of JPMorgan.  It ran from the Broker/Dealer Group, where Madoff and BMIS maintained a bank account that no one honestly could have believed was serving any legitimate purpose, to Equity Exotics, where JPMorgan learned of the red flags inherent in Madoff's investment strategy, to JPMorgan's London office, which learned that individuals might be laundering money through BMIS feeder funds, to the Private Bank, which maintained intimate relationships with one of Madoff's largest customers, to Treasury & Security Services, which was responsible for investing the balance of the 703 Account in short-term securities.

350.    The various divisions of JPMorgan that were involved with Madoff communicated with each other about Madoff.  When Equity Exotics wanted to set up a meeting with Madoff, and when the Risk Management Division needed to obtain BMIS's financial documents, they knew to contact Madoff's and BMIS's relationship manager in the Broker/Dealer Group.  The

Broker/Dealer Group also communicated with the Private Bank when customers at the Private Bank were interested in investing with Madoff, and with Treasury & Security Services when the relationship manager was trying to find new products that he could market to Madoff.

351.    The various individuals and divisions of JPMorgan regularly interacted to gain additional information about business opportunities.  But those channels were only utilized for the purpose of increasing JPMorgan's fees and profits.  JPMorgan was uniquely positioned for 20 years to see Madoff's crimes and put a stop to them.  The due diligence performed by JPMorgan was not reasonable, independent or adequate in light of the clear evidence of fraudulent activity at BMIS. JPMorgan allowed the fraud to continue unabated.

## DAMAGES TO JPMORGAN

352.    As a result of Defendants' improprieties, JPMorgan has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)       $2.6 billion in penalties and settlements to various federal authorities and plaintiffs in civil cases concerning JPMorgan's conduct related to Madoff, in connection with the Deferred Prosecution Agreement;

(b)       costs associated with implementing internal controls and governance practices to prevent misconduct in the future – mechanisms which could have, and should have, been implemented more than a decade ago at a fraction of the cost;

(c)       costs incurred in defending JPMorgan in numerous civil actions concerning JPMorgan's conduct related to Madoff;

(d)       costs incurred to JPMorgan's goodwill and reputation as a result of JPMorgan's entry into the Deferred Prosecution Agreement, the monetary amount of which will be significant and difficult to quantify; and

(e)       costs incurred from compensation and benefits paid to Defendants, who as directors and/or officers have breached their duties to JPMorgan.

353.    These actions have irreparably damaged JPMorgan's corporate image and goodwill.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

354.    Plaintiffs incorporate ¶¶1-353.

355.    Plaintiffs bring this action derivatively in the right and for the benefit of JPMorgan to redress injuries suffered, and to be suffered, by JPMorgan as a direct result of Defendants' breaches of fiduciary duty and unjust enrichment, as well as the aiding and abetting thereof.  JPMorgan is named as a nominal party in this action solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

356.    Plaintiffs will adequately and fairly represent the interests of JPMorgan in enforcing and prosecuting its rights.  Plaintiffs are and were owners of JPMorgan stock during all times relevant to Defendants' wrongful course of conduct alleged herein.

357.    As of February 19, 2014, the date this Complaint was filed, the JPMorgan Board consisted of the following 11 individuals: Dimon, Bammann, Bell, Bowles, Burke, Crown, Flynn, Jackson, Neal, Raymond, and Weldon.

358.    Accordingly, Defendants make up a majority of the Board in place at the time this Complaint was filed.  Defendants participated in, approved, and/or permitted the wrongs alleged herein, concealed or disguised those wrongs, or recklessly and/or negligently disregarded them.  Therefore, a majority of the Board is not disinterested and/or lacks sufficient independence to exercise business judgment as alleged herein.

359.    Plaintiffs did not make a pre-suit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act.  The wrongful acts described in this Complaint evidence a pattern of conduct showing Defendants' wholesale abandonment of their

fiduciary duties.  Those acts include, among other things, recklessly permitting the Company to facilitate and perpetuate Madoff's massive Ponzi scheme in the face of repeated and glaring warnings signs, and willfully failing to establish an adequate AML program.

360.    Many years before Madoff's arrest, Defendants knew, consciously disregarded and/or were reckless in not knowing about: (i) the major discrepancies in the FOCUS Reports and income statements for BMIS, such as the lack of customer receivables or payables on those documents, when compared with Levy's account statements reflecting Madoff as Levy's investment advisor; (ii) the suspicious round-trip transactions in Madoff's 703 Account that served no legitimate business purpose and appeared to JPMorgan executives to be, at the very least, a check-kiting scheme; (iii) the problems with the 703 Account such as the balance falling to nearly zero in 2008, the comingling of funds from all of the supposed "investors," and the free flow of 703 Account funds between Madoff and his customers; (iv) warnings from JPMorgan managers as early as 1998 stating that there were "too many red flags" to proceed with further due diligence; (v) the October 16, 2008 Equity Exotics report noting that, among other warning signs, Madoff was resisting providing meaningful disclosures; (vi) JPMorgan's October 29, 2008 suspicious activity report filed with the U.K.'s SOCA noting that Madoff was likely stealing from his customers; (vii) BMIS's use of an obscure three-person accounting firm; (viii) Madoff's refusal to allow JPMorgan's Investment Bank to perform "full due diligence" on BMIS; (ix) Madoff's choice to not charge fees for his money-management services, essentially forsaking billions of dollars; and (x) the utter lack of volatility of Madoff's returns, which was only 2.5% over the preceding 17 years, and BMIS only lost money in 2 of 214 rolling quarterly periods since 1990.  The members of JPMorgan's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top

ranks of the corporation for the violations of law complained of herein.  These are people they have developed professional relationships with, who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

361.    The acts and decisions of the JPMorgan Board constitute a breach of fiduciary duties of care, oversight, good faith, candor and loyalty.  These decisions were not, and could not have been, the product of the Board's good faith, informed business judgment.  As such, and for this separate and independent ground alone, demand on the Board to bring these claims on the Company's behalf would be a futile gesture.

**Demand Is Excused as to Defendants Dimon, Bammann, Bell,**
**Bowles, Burke, Crown, Flynn, Jackson, Neal, Raymond, and Weldon**

362.    Demand here is futile because Defendants Dimon, Bammann, Bell, Bowles, Burke, Crown, Flynn, Jackson, Neal, Raymond, and Weldon have demonstrated outright hostility to asserting claims against Defendants Lipp and Shipley for their role in allowing the Madoff Ponzi scheme to proliferate.  Indeed, upon information and belief, the Board has not appointed a Special Committee or taken any action whatsoever against any current or former employee or director of JPMorgan related to the Madoff debacle.  Indeed, any suit to remedy the wrongs complained of herein would expose these directors (especially the seven who were on the Board at the time of the wrongdoing) to significant personal liability for their breaches of fiduciary duties and other misconduct because these current directors participated in, approved, ratified, or permitted the conduct described herein.

363.    On January 3, 2014, the Director Defendants adopted a resolution authorizing JPMorgan to enter into the Deferred Prosecution Agreement with the U.S. Attorney.  On January 6, 2014, the Director Defendants caused JPMorgan to enter into the Deferred Prosecution Agreement

with the U.S. Attorney. The Director Defendants, by approving and entering into this agreement, consented to the filing of a two-count criminal Information charging JPMorgan with failure to maintain an effective AML program, and failure to file an SAR, in connection with its relationship to Madoff. In addition, the Deferred Prosecution Agreement specifically requires JPMorgan to cooperate with federal government agencies regarding any matter relating to the conduct described in the criminal Information or Statement of Facts, or any matter relating to the fraud committed at BMIS, and leaves open the possibility for criminal prosecution of JPMorgan, including its directors. The Deferred Prosecution Agreement further provides that should the U.S. Attorney determine, in its sole discretion, that JPMorgan has knowingly given false, incomplete or misleading information either during the term of the Deferred Prosecution Agreement or in connection with the U.S. Attorney's investigation of the conduct described in the Information or Statement of Facts, JPMorgan shall, in the U.S. Attorney's sole discretion, thereafter be subject to prosecution for any federal criminal violation, or suit for any civil cause of action, including, but not limited to, a prosecution or civil action based on the Information, the Statement of Facts, the conduct described therein, or perjury and obstruction of justice.

364. Despite the Director Defendants' clear obligations for candor under the very terms of the Deferred Prosecution Agreement, upon information and belief, it does not appear that the Director Defendants made the U.S. Attorney aware of Defendants Shipley's and Lipp's repeated meetings with Madoff to discuss the numerous warning signs that BMIS was a fraud. Despite their regular meetings with Madoff, Defendants Shipley and Lipp were more concerned with keeping the profits JPMorgan received from BMIS and Levy than meaningfully inquiring about the problems they were aware of at BMIS.

365.    The Board's response to this has been silence.  Upon information and belief, there has not been any meaningful internal investigation to determine if the Board should take action against Defendants Shipley and/or Lipp or themselves for allowing Madoff's scheme to proceed for so long despite the glaring red flags, personally known to them, that something was drastically wrong, in part because any truly independent investigation would target, among others, a majority of Board members, including Defendant Dimon and members of the Risk Policy and Audit Committees.  A board whose company has been forced to agree to a Deferred Prosecution Agreement that requires the utmost candor in helping governmental authorities in any investigation related to the Madoff scam will not be responsive to a demand for investigation or litigation from shareholders.  Instead, a board in such a situation is in a highly defensive posture, and would refuse any such demand.  In fact, even five years after Madoff's arrest, the Director Defendants have not and will not, absent this lawsuit, prosecute any action against themselves or Defendants Shipley and Lipp because to do so exposes them to criminal and civil liability for breaching their duties and failing to comply with the terms of the Deferred Prosecution Agreement.  Accordingly, any demand upon the JPMorgan Board would be futile and is excused.

366.    In addition, each member of the JPMorgan Board participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from JPMorgan's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.  As a result of their access to and review of internal corporate documents (including the reports and notes of JPMorgan's internal interviews of more than 90 JPMorgan employees following Madoff's arrest), conversations and connections with other corporate officers, employees, and directors, and attendance at management and/or Board meetings, each of the Director Defendants knew the adverse non-public

information regarding the BMIS/Madoff fraud.  Pursuant to their specific duties as Board members, the Director Defendants are charged with managing JPMorgan and conducting its business affairs, including the ultimate responsibility for ensuring that JPMorgan maintains an effective BSA/AML internal control structure.  Defendants breached the fiduciary duties that they owed to JPMorgan and its shareholders in that they failed to prevent and correct the BMIS/Madoff fraud and willfully failed to establish an adequate AML program.  Thus, the JPMorgan Board cannot exercise independent, objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because a majority of its members participated personally in the wrongdoing or are dependent upon other defendants who did.

367.    In sum, to bring this action for breaching their fiduciary duties, the members of the JPMorgan Board would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do.

368.    The acts complained of herein constitute violations of the fiduciary duties owed by JPMorgan's officers and directors and these acts are incapable of ratification.

369.    The members of JPMorgan's Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

370.    The members of JPMorgan's Board are well-compensated for their Board service. The Company's most recent proxy statement, filed with the SEC on April 10, 2013, revealed that the Board earned the following compensation from JPMorgan in 2012:

| Director | Fees earned or paid in cash ($) | 2012 Stock award ($) | Total ($) |
|---|---|---|---|
| James A. Bell | $85,000 | $ 170,000 | $255,000 |
| Crandall C. Bowles | 100,000 | 170,000 | 270,000 |
| Stephen B. Burke | 75,000 | 170,000 | 245,000 |
| David M. Cote | 75,000 | 170,000 | 245,000 |
| James S. Crown | 132,500 | 170,000 | 302,500 |
| Timothy P. Flynn[9] | 50,000 | — | 50,000 |
| Ellen V. Futter | 75,000 | 170,000 | 245,000 |
| William H. Gray, III | 35,417 | 170,000 | 205,417 |
| Laban P. Jackson, Jr. | 255,000 | 170,000 | 425,000 |
| David C. Novak | 35,000 | 170,000 | 205,000 |
| Lee R. Raymond | 90,000 | 170,000 | 260,000 |
| William C. Weldon | 86,250 | 170,000 | 256,250 |

371.    Filing a derivative action would put the Director Defendants' continued receipt of these lucrative fees in jeopardy.  For this reason, the Director Defendants are incapable of exercising independent objective business judgment in deciding whether to bring this action.

372.    Based on the particularized facts above, the Director Defendants will not (and have not) brought suit in this action because, to properly prosecute this lawsuit, JPMorgan's directors would have to sue themselves and the other defendants, requiring them to expose themselves and their comrades to criminal liability, millions of dollars in civil liability and/or sanctions.

373.    Nor is JPMorgan's Board exculpated from personal liability because their breaches of fiduciary duty included breaches of their duties of loyalty, acts and omission not in good faith, intentional misconduct and knowing violations of law.

---

[9]    Flynn joined the Board in May 2012.  Gray and Novak retired from the Board in May 2012 on the eve of the 2012 annual meeting. Retainers for Board and committee memberships were pro-rated.

374.     If JPMorgan's current officers and directors are protected against personal liability for their acts of mismanagement and breaches of fiduciary duties alleged in this Complaint by Director and Officer ("D&O") Insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders of JPMorgan. However, upon information and belief, Plaintiffs believe that the D&O Insurance policies covering Defendants in this case contain provisions that eliminate coverage for any action brought directly by JPMorgan against Defendants, known as the "insured versus insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of JPMorgan, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

375.     JPMorgan has been and will continue to be exposed to significant losses due to Defendants' wrongdoing. Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct. Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

376.     Plaintiffs therefore bring this derivative action to: (i) recover damages against JPMorgan's officers and directors for the benefit of the Company; and (ii) require the Company to reform and improve its corporate governance and internal procedures to protect JPMorgan and its shareholders from a repeat of the damaging events described above.

**Demand Is Excused as to Defendant Dimon**

377.    Demand is futile as to Defendant Dimon because as the CEO, Chairman and President of JPMorgan, Defendant Dimon owed the utmost duty and responsibility to the Company. However, in a direct breach and dereliction of his fiduciary duties, Defendant Dimon knowingly and/or recklessly engaged in misconduct that has caused the Company to experience hundreds of millions in losses, exposed the Company to even more liability, and forced the Company to enter into the Deferred Prosecution Agreement whereby it admitted criminal liability related to the BMIS/Madoff fraud.  Moreover, Defendant Dimon signed all of the Company's post-2005 annual financial reports (filed with the SEC), each of which included a certification, pursuant to the Sarbanes-Oxley Act, certifying:

> The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):
>
> *        *        *
>
> Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

378.    This certification was false and misleading because, as described herein, Defendant Dimon knew, or was reckless in not knowing, that BMIS/Madoff was running a fraudulent Ponzi scheme because he and the other Defendants were bombarded with red flags warning of the fraud. Because Defendant Dimon faces a substantial likelihood of liability for breaching his fiduciary duty of loyalty to the Company and its shareholders, demand upon him is futile.

379.    Additionally, demand is excused as to Defendant Dimon because he is not independent.  According to relevant portions of the Company's 2013 proxy statement, Defendant Dimon is not an independent director.  The principal professional occupation of Defendant Dimon is

his employment with JPMorgan, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.  For example, JPMorgan paid Defendant Dimon total compensation of $23 million in 2011 and $18.7 million in 2012.  Defendant Dimon serves as both the CEO and as a director of JPMorgan's Board, and did so throughout the relevant period.  As a result, Defendant Dimon lacks independence from the remaining Director Defendants due to his interest in maintaining his executive position at JPMorgan.

380.    Similarly, the extensive privileges and perquisites paid to Defendant Dimon's family members renders him not independent.  For example, since at least 2009, the Company has employed Defendant Dimon's father as a broker and paid him over $1.59 million in compensation in 2012.

381.    In sum, Defendant Dimon is incapable of impartially considering a demand to commence and vigorously prosecute this action because he faces substantial likelihood of personal liability and because he had and has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation.  Demand is therefore futile as to Defendant Dimon.

## COUNT I

### Against Defendants Shipley and Lipp for Breach of Fiduciary Duty of Loyalty (and Candor and Good Faith)

382.    Plaintiffs incorporate ¶¶1-381.

383.    Defendants Shipley and Lipp owed JPMorgan and its shareholders a fiduciary duty of loyalty (and candor and good faith).  Under this duty, Defendants Shipley and Lipp, when faced with a known duty to act, here ensuring that JPMorgan maintained an effective BSA/AML internal control structure, which includes JPMorgan's legal duty to file an SAR in light of evidence of money

laundering by Madoff, were duty-bound to proactively implement internal controls and policies designed to ensure JPMorgan's compliance with these laws.

384.    However, Defendants Shipley and Lipp failed to cause JPMorgan to file an SAR concerning Madoff.

385.    As a result of Defendants Shipley's and Lipp's disloyalty, JPMorgan has been injured.  Accordingly, JPMorgan is entitled to damages.

<div align="center">

**COUNT II**

**Against Defendants Shipley and Lipp for Abuse of Control**

</div>

386.    Plaintiffs incorporate ¶¶1-385.

387.    Defendants Shipley's and Lipp's misconduct alleged herein constitutes an abuse of their ability to control and influence JPMorgan, for which they are legally responsible.

388.    As a direct and proximate result of Defendants Shipley's and Lipp's abuse of control, JPMorgan has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, Defendants Shipley and Lipp are liable to JPMorgan.

<div align="center">

**COUNT III**

**Against Defendants Shipley and Lipp for Corporate Waste**

</div>

389.    Plaintiffs incorporate ¶¶1-388.

390.    As a result of the foregoing misconduct, Defendants Shipley and Lipp have caused JPMorgan to waste valuable corporate assets.

391.    As a direct and proximate result of Defendants Shipley's and Lipp's corporate waste, JPMorgan has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, Defendants Shipley and Lipp are liable to JPMorgan.

## COUNT IV

### Against Defendants Shipley and Lipp for Unjust Enrichment

392.    Plaintiffs incorporate ¶¶1-391.

393.    By their wrongful acts and omissions, Defendants Shipley and Lipp were unjustly enriched at the expense of and to the detriment of JPMorgan.  Defendants Shipley and Lipp were unjustly enriched as a result of the salary, fees, stock options, and other payments they received while breaching their fiduciary duty owed to JPMorgan.

394.    Plaintiffs, as shareholders of JPMorgan, seek restitution from Defendants Shipley and Lipp, and each of them, and seek an order of this Court disgorging all profits, benefits, and other improper payments obtained by Defendants Shipley and Lipp, and each of them, from their wrongful conduct and fiduciary breaches.  As a result of Defendants Shipley's and Lipp's unjust enrichment, JPMorgan has been injured and is entitled to damages.

## COUNT V

### Against the Director Defendants for Breach of Fiduciary Duty of Loyalty (and Candor and Good Faith)

395.    Plaintiffs incorporate ¶¶1-394.

396.    The Director Defendants owed JPMorgan and its shareholders a fiduciary duty of loyalty (and candor and good faith).  Under this duty, the Director Defendants, when faced with a known duty to act, here ensuring that JPMorgan maintained an effective BSA/AML internal control structure, which includes JPMorgan's legal duty to file an SAR in light of evidence of money laundering by Madoff, were duty-bound to proactively implement internal controls and policies designed to ensure JPMorgan's compliance with these laws.

397.    However, the Director Defendants failed to cause JPMorgan to file an SAR concerning Madoff.

398.    As a result of the Director Defendants' disloyalty, JPMorgan has been injured. Accordingly, JPMorgan is entitled to damages.

## COUNT VI

### Against the Director Defendants for Abuse of Control

399.    Plaintiffs incorporate ¶¶1-398.

400.    The Director Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence JPMorgan, for which they are legally responsible.

401.    As a direct and proximate result of the Director Defendants' abuse of control, JPMorgan has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to JPMorgan.

## COUNT VII

### Against the Director Defendants for Corporate Waste

402.    Plaintiffs incorporate ¶¶1-401.

403.    As a result of the foregoing misconduct, the Director Defendants have caused JPMorgan to waste valuable corporate assets.

404.    As a direct and proximate result of the Director Defendants' corporate waste, JPMorgan has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to JPMorgan.

## COUNT VIII

### Against the Director Defendants for Unjust Enrichment

405.    Plaintiffs incorporate ¶¶1-404.

406.    By their wrongful acts and omissions, the Director Defendants were unjustly enriched at the expense of and to the detriment of JPMorgan.  The Director Defendants were unjustly enriched

as a result of the salary, fees, stock options, and other payments they received while breaching their fiduciary duty owed to JPMorgan.

407.    Plaintiffs, as shareholders of JPMorgan, seek restitution from the Director Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other improper payments obtained by the Director Defendants, and each of them, from their wrongful conduct and fiduciary breaches.  As a result of the Director Defendants' unjust enrichment, JPMorgan has been injured and is entitled to damages.

## COUNT IX

### Against the Director Defendants for Violations of
### Section 14(a) of the Exchange Act and Rule 14a-9

408.    This claim for relief is not based on any allegations of knowing or reckless conduct by any Director Defendant.  This claim does not allege, and does not sound in, fraud, and Plaintiffs disclaim any reliance upon or reference to allegations of fraud.

409.    Plaintiffs incorporate ¶¶1-408.

410.    The Director Defendants, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, solicited by means of a proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing statements which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts, or omitted to state material facts necessary in order to make the statements therein not false or misleading or necessary to correct statements in earlier communications with respect to the solicitation of the proxy for the same meeting or subject matter which was false or misleading.

411.   The Proxy Statements violated §14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder because they omitted material facts, including among other things, the following:

(a)   the numerous instances in which the Director Defendants were informed, or otherwise made aware, of legal compliance violations concerning Madoff and JPMorgan's AML obligations, including timely filing suspicious activity reports;

(b)   the true nature of the strength and efficacy of JPMorgan's AML monitoring system; and

(c)   the nature of the Director Defendants' performance of their duties under the charters of the Board's various committees, which cast doubt on the Director Defendants' integrity and fitness to hold office, and which was material to shareholders' decisions to vote for the Director Defendants and shareholders' approval of the Director Defendants' compensation.

412.   In the exercise of reasonable care, the Director Defendants should have known that the Proxy Statements were materially false and misleading.

413.   The misrepresentations and omissions in the Proxy Statements were material to Plaintiffs and would be material to reasonable investors who voted on each Proxy Statement.  The Proxy Statements were an essential link in the accomplishment of the continuation of the Director Defendants' unlawful conduct, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the Director Defendants' positions and proxy recommendations, the executive officers' compensation, the Director Defendants' compensation, and JPMorgan's compensation policies and practices.

414.   JPMorgan was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

415.     By engaging in the conduct alleged above, the Director Defendants violated §14(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder.

416.     Plaintiffs, as shareholders of JPMorgan, seek damages and other relief for JPMorgan.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of JPMorgan, demand judgment as follows:

A.     Declaring that Defendants, and each of them, have committed breaches of their fiduciary duty of loyalty to JPMorgan;

B.     Determining that Defendants have been unjustly enriched and requiring them to make restitution;

C.     Requiring Defendants to pay JPMorgan damages for the harm the Company has suffered and will suffer by reason of the conduct complained of herein, including the costs and expenses of investigations, regulatory proceedings and litigation, fees for counsel and other professionals and any fines or judgments, and also including contribution and indemnification for any liability JPMorgan incurs;

D.     Ordering that Defendants personally bear their own legal fees in defending this action and finding they are not entitled to indemnification;

E.     Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: February 19, 2014

ROBBINS GELLER RUDMAN
    & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARK S. REICH
ALAN I. ELLMAN

DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
mreich@rgrdlaw.com
aellman@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
BENNY C. GOODMAN III
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
bennyg@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
STUART A. DAVIDSON
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
sdavidson@rgrdlaw.com

*Attorneys for Plaintiffs*

- 113 -

VERIFICATION

I, Danny J. Koeppel, hereby declare as follows:

I am the Executive Director for the Central Laborers' Pension Fund, plaintiff in the within entitled action. Central Laborers' Pension Fund is a shareholder of JPMorgan Chase & Co. Central Laborers' Pension Fund was a shareholder at the time of the wrongdoing complained of and has continuously remained a shareholder. Central Laborers Pension Fund Fund has retained competent counsel and is ready, willing and able to pursue this action vigorously on behalf of JPMorgan Chase & Co. I have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Abuse of Control, Corporate Waste, Unjust Enrichment, and Violations of the Federal Securities Laws. Based upon discussions with, and reliance upon, my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Date: _2/18/2014_                           CENTRAL LABORERS' PENSION FUND

                                            By: _____
                                                Danny J. Koeppel, Executive Director

VERIFICATION

I, Joseph M. Little, hereby declare as follows:

I am a Trustee for Steamfitters Local 449 Pension Fund, plaintiff in the within entitled action. Steamfitters Local 449 Pension Fund is a shareholder of JPMorgan Chase & Co. Steamfitters Local 449 Pension Fund was a shareholder at the time of the wrongdoing complained of and has continuously remained a shareholder. Steamfitters Local 449 Pension Fund has retained competent counsel and is ready, willing and able to pursue this action vigorously on behalf of JPMorgan Chase & Co. I have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Abuse of Control, Corporate Waste, Unjust Enrichment, and Violations of the Federal Securities Laws. Based upon discussions with, and reliance upon, my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Date: __2/11/2014__                    STEAMFITTERS LOCAL 449 PENSION FUND


By: _____
        Joseph M. Little, Trustee